**No. 13-2451**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**LIBERTY MUTUAL FIRE INSURANCE COMPANY,**

*Plaintiff-Appellant*,

v.

**J M SMITH CORPORATION, and
SMITH DRUG COMPANY, INC.**

*Defendants-Appellees*.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA, NO. 7:12-cv-02824-TMC

**OPENING BRIEF OF APPELLANT
LIBERTY MUTUAL FIRE INSURANCE COMPANY**

Laura A. Foggan
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
(202) 719-7049 (facsimile)

*Counsel for Appellant
Liberty Mutual Fire
Insurance Company*

January 27, 2014

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1, Liberty Mutual Fire Insurance Company, the appellant, makes the following disclosures:

1.      Is party/amicus a publicly held corporation or other publicly held entity?

No.

2.      Does party/amicus have any parent corporations? If yes, identify all parent corporations, including grandparent and great-grandparent corporations.

Liberty Mutual Group Inc. owns 100% of the stock of Liberty Mutual Fire Insurance Company.  LMHC Massachusetts Holdings Inc. owns 100% of the stock of Liberty Mutual Group Inc.  Liberty Mutual Holding Company Inc. owns 100% of the stock of LMHC Massachusetts Holdings Inc.

3.      Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

No.

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?

No.

4.      Is there any other publicly held corporation or other publicly held

entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

No.

5.    Is party a trade association?

No.

6.    Does this case arise out of a bankruptcy proceeding?

No.

# TABLE OF CONTENTS

**STATEMENT OF ISSUES PRESENTED FOR REVIEW**................................1

**STATEMENT OF THE CASE**................................................................2

**STATEMENT OF FACTS**....................................................................3

I.    THE UNDERLYING WEST VIRGINIA ACTION..............................3

II.   THE LIBERTY MUTUAL POLICIES..............................................6

**SUMMARY OF ARGUMENT**................................................................7

**ARGUMENT**....................................................................................9

I.    STANDARD OF REVIEW..............................................................9

II.   WEST VIRGINIA'S "PILL MILL" COMPLAINT DID NOT
      ALLEGE A COVERED "OCCURRENCE"..........................................10

      A.    West Virginia Alleges Conduct Incompatible with Mere
            Negligence...........................................................................10

            1.    The Complaint Alleges Intentional, Illegal Conduct
                  Factually Incompatible With "Negligence," Not An
                  Accidental "Occurrence."....................................................11

            2.    Coverage Is Not Created By Labeling Willful, Intentional
                  Conduct Negligence..........................................................11

            3.    The South Carolina Supreme Court's Ruling in *Collins*
                  Controls This Case............................................................13

            4.    Numerous Decisions from Other Jurisdictions Support
                  South Carolina Law In Finding That Allegations Such As
                  The West Virginia "Pill Mill" Claims Do Not Allege An
                  Occurrence......................................................................15

      B.    Persistent, Knowing and Willful Violations of Statutes
            Designed to Combat An Epidemic of Prescription Drug Abuse
            Are Not An "Occurrence"......................................................16

            1.    The Harm At Issue Is The Normal Consequence of
                  Illegally Distributing Prescription Drugs In Violation of
                  Controlled Substance Laws...............................................17

            2.    Normal Consequences Are Not An Accident......................17

            3.    The Action Alleges Persistent Violations of Laws

Specifically Enacted to Combat Prescription Drug Abuse......18

4.     Extrinsic Materials Cannot Be Substituted For the Complaint's Actual Allegations In Determining a Duty to Defend ................................................................................21

III.    LIBERTY MUTUAL HAS NO DUTY TO DEFEND FOR THE ADDITIONAL REASON THAT WEST VIRGINIA SEEKS TO RECOVER DUE TO ECONOMIC COSTS, NOT BODILY INJURY OR PROPERTY DAMAGE.........................................................23

A.     Claims For Economic Loss Do Not Seek Damages Because Of "Bodily Injury" or "Property Damage."...........................23

1.     The West Virginia Action Concerns the State's Economic Losses...................................................24

2.     Referring to Bodily Injury Does Not Create Coverage In a Case About Economic Loss. ..................................27

IV.    LIBERTY MUTUAL IS ALSO ENTITLED TO SUMMARY JUDGMENT ON ITS DUTY TO INDEMNIFY AND CONTRACT CLAIMS. ............................................................28

V.     ENFORCING THE POLICY AS WRITTEN IS IMPORTANT TO THE INSURANCE SYSTEM.........................................29

**CONCLUSION**................................................................30

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Adolph Coors Co. v. Truck Insurance Exchange,*
  960 A.2d 617 (D.C. 2008) .............................................................15, 16

*AES Corp. v. Steadfast Insurance Co.,*
  725 S.E.2d 532 (Va. 2012) ...............................................................18

*Allstate Insurance Co. v. Wilson,*
  193 S.E.2d 527 (S.C. 1972) .............................................................10

*American Southern Insurance Co. v. Conniff,*
  No. 2:09-CV-01965, 2010 WL 2710568 (D.S.C. July 7, 2010)........................23

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986)...........................................................................9

*AT&T Wireless PCS, Inc. v. Winston-Salem Zoning Board of Adjustment,*
  172 F.3d 307 (4th Cir. 1999) ..............................................................9

*Auto Owners Insurance Co. v. Newman,*
  684 S.E.2d 541 (S.C. 2009) ..........................................................11, 25

*Auto-Owners Insurance Co. v. Madison at Park West Property Owners Ass'n,*
  834 F. Supp. 2d 437 (D.S.C. 2011) .....................................................9

*B.L.G. Enterprises, Inc. v. First Financial Insurance Co.,*
  514 S.E.2d 327 (S.C. 1999) ...............................................................22

*Baker v. American Insurance Co. of Newark, New Jersey,*
  324 F.2d 748 (4th Cir. 1963) ........................................................18, 20

*C.Y. Thomason Co. v. Lumbermens Mutual Casualty Co.,*
  183 F.2d 729 (4th Cir. 1950) ........................................................17, 19

*Collins Holding Corp. v. Wausau Underwriters Insurance Co.,*
  666 S.E.2d 897 (S.C. 2008) .....................................10, 11, 12, 13, 14

# TABLE OF AUTHORITIES

(continued)

**Page**

*Diamond State Insurance Co. v. Chester-Jensen Co*,
611 N.E.2d 1083 (Ill. App. Ct. 1993) ............................................................25

*Ducker v. Century Surety & Insurance Corp.*,
107 S.E.2d 342 (S.C. 1959) ............................................................17

*Erie R. Co. v. Tompkins*,
304 U.S. 64 (1938)............................................................9

*Graphic Arts Mutual Insurance Co. v. Caldwell Chevrolet, Inc.*,
No. 0:11-cv-01255, 2012 WL 3962752 (D.S.C. Sept. 11, 2012)......................10

*Hartford Accident & Indemnity Co. v. South Carolina Insurance Co.*,
166 S.E.2d 762 (S.C. 1969) ............................................................10

*HPF, LLC v. General Star Indemnity Co.*,
788 N.E.2d 753 (Ill. App. Ct. 2003) ............................................................27

*Industrial Enterprises, Inc. v. Penn America Insurance Co.*,
637 F.3d 481 (4th Cir. 2011) ............................................................25

*Isle of Palms Pest Control Co. v. Monticello Insurance Co.*,
459 S.E.2d 318 (S.C. Ct. App. 1994) ............................................................25

*Manufacturers & Merchants Mutual Insurance Co. v. Harvey*,
498 S.E.2d 222 (S.C. Ct. App. 1998) ............................................................12, 13, 15

*MCE Automotive, Inc. v. National Casualty Co.*,
No. 6:11-cv-01245, 2012 WL 4479163 (D.S.C. 2012),
*aff'd*, 535 Fed. App'x 303 (4th Cir. 2013)............................................................11, 12, 13

*Medmarc Casualty Insurnace Co. v. Avent America, Inc.*,
612 F.3d 607 (7th Cir. 2010) ............................................................26

-ii-

# TABLE OF AUTHORITIES

(continued)

**Page**

*Minnesota Lawyers Mutual Insurance Co. v. Antonelli, Terry, Stout & Kraus, LLP*,
  355 F. App'x 698 (4th Cir. 2009) .......................................................................23

*Monahan v. County of Chesterfield*,
  95 F.3d 1263 (4th Cir. 1996) ...............................................................................9

*Pennsylvania National Mutual Casualty Insurance Co. v. Roberts*,
  668 F.3d 106 (4th Cir. 2012) .............................................................................29

*Shelby Mutual Insurance Co. v. Askins*,
  413 S.E.2d 855 (S.C. Ct. App. 1992) .................................................................23

*State Farm Fire & Casualty Co. v. Tran*,
  No. 1:10-CV-00469, slip op. (S.D. Miss. Aug. 20, 2012) ...........................20, 21

*State Farm Fire & Casualty Insurance Co. v. Reed*,
  No. 7:07-2958-HFF, 2009 WL 735133 (D.S.C. Mar. 19, 2009) .................17, 19

*State Farm Mutual Automobile Insurance Co. v. Arnold*,
  276 F. Supp. 765 (D.S.C. 1967) ....................................................................27, 28

*Steadfast Insurance Co. v. Purdue Federick Co.*,
  No. X08CV020191697S, 2006 WL 1149202
  (Conn. Super. Ct. Apr. 10, 2006)........................................................................26

*TIG v. Andrews Sporting Goods, Inc.*,
  No. B153587, 2002 Cal. App. LEXIS 2105 (Cal. Ct. App. June 12, 2002) ......27

*Union Insurance Co. v. Soleil Group, Inc.*,
  465 F. Supp. 2d 567 (D.S.C. 2006) ....................................................................28

*USAA Property & Casualty Insurance Co. v. Clegg*,
  661 S.E.2d 791 (S.C. 2008) ...............................................................................22

-iii-

# TABLE OF AUTHORITIES

(continued)

**Page**

*Yaun v. Baldridge*,
    134 S.E.2d 248, 251 (S.C. 1964) ................................................................20

*Zurich-American Insurance Co. v. Audiovox Corp.*,
    741 N.Y.S.2d 692 (App. Div. 2002) ...........................................................27

**Statutes**

28 U.S.C. § 1291 .......................................................................................................1

28 U.S.C. § 1332 .......................................................................................................1

28 U.S.C. § 2201 .......................................................................................................1

28 U.S.C. § 2202 .......................................................................................................1

S.C. Code Ann. § 38-61-10.......................................................................................9

**Rules**

Fed. R. Civ. P. 54(b) .......................................................................................1, 3, 8

Fed. R. Civ. P. 56 .....................................................................................................9

**Other Authorities**

Allan D. Windt, Insurance Claims & Disputes................................................22, 27

## JURISDICTIONAL STATEMENT

This is an insurance contract dispute whose value exceeds $75,000, exclusive of interest and costs, between parties with complete diversity of citizenship. The United States District Court for the District of South Carolina had jurisdiction under 28 U.S.C. §§ 1332, 2201, and 2202. (*See* Joint Appendix ("JA"), page 010)

On September 24, 2013, the district court granted Defendants J M Smith Corp. and Smith Drug Co., Inc. (collectively, "J M Smith") partial summary judgment on the duty to defend and denied Plaintiff Liberty Mutual Fire Insurance Company ("Liberty Mutual") summary judgment on both its duty to defend and its duty to indemnify. (JA331) On November 12, 2013, the court held that its September 24, 2013 order was final as it is the ultimate disposition on the duty to defend issue. It expressly determined that there was no just reason for delay and that equitable considerations and the interests of judicial economy favored entry of partial final judgment pursuant to Fed. R. Civ. P. 54(b). (JA358)

Liberty Mutual timely filed an appeal. (JA361) This Court now has jurisdiction pursuant to 28 U.S.C. § 1291, providing jurisdiction for "appeals from all final decisions of the district courts of the United States."

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

(1)    Whether under South Carolina law the underlying complaint alleged a covered "occurrence" within the meaning of that term in the Liberty Mutual Policies.

- 1 -

(2)    Whether the under South Carolina law the underlying complaint sought damages because of "bodily injury" under the Liberty Mutual Policies.

(3)    Whether under South Carolina law Liberty Mutual had a duty to defend the underlying complaint.

## STATEMENT OF THE CASE

Appellant Liberty Mutual issued a series of commercial general liability policies to appellee J M Smith beginning in 2000.  J M Smith sought coverage under these policies for a complaint (the "West Virginia Complaint" or the "Complaint") filed against J M Smith and other drug distributors by the West Virginia Attorney General on behalf of his state (the "West Virginia Action"). Liberty Mutual filed this action in the District Court for the District of South Carolina on September 28, 2012 for judicial guidance on its rights and obligations under the insurance contracts with respect to the West Virginia Action.  (JA008)

On January 17, 2013, Liberty Mutual moved for summary judgment "on the threshold ground that there is no covered occurrence" under the policies.  (JA203) In response, J M Smith cross-moved for summary judgment on the duty to defend. (JA236) Judge Cain held oral argument on the motions on May 9, 2013.  (JA298)

On September 24, 2014, the district court granted summary judgment to J M Smith on the duty to defend.  It held that the West Virginia Complaint "alleges an occurrence and Liberty Mutual has a duty to defend."  (JA340)  The court also denied Liberty Mutual summary judgment regarding its duty to defend and to

- 2 -

indemnify, noting that "a liability insurer's duty to indemnify is determined by the findings of the fact finder in the underlying case." (*Id.*) On November 12, 2013, the lower court directed entry of final judgment regarding Liberty Mutual's duty to defend pursuant to Fed. R. Civ. P. 54(b). (JA358) Liberty Mutual timely appealed on December 2, 2013. (JA361)

## STATEMENT OF FACTS

## I. THE UNDERLYING WEST VIRGINIA ACTION.

In June 2012, the Attorney General of West Virginia sued a number of distributors of controlled substances, among them "J.M. Smith Corporation d/b/a Smith Drug Company." *W. Va. ex rel. McGraw v. AmerisourceBergen Drug. Corp.*, 12-C-141 (W. Va. Cir. Ct., Boone Cnty.) (JA139) As alleged in the Complaint, this action was brought to address "the epidemic of prescription drug abuse and its costs" to the State of West Virginia. (JA140) According to the Complaint, abuse of controlled substances has risen to pandemic levels in West Virginia, causing numerous "problems, crimes, damages, and losses." (JA141) According to the Complaint, this epidemic is the subject of "widespread publicity," both nationally and in West Virginia. (JA152) As a result of this "epidemic," West Virginia enacted "[c]hanges in law and regulations which were designed specifically to address the growing problem of prescription drug abuse." (*Id.*)

The defendants, a number of drug distributors including J M Smith,

- 3 -

allegedly engaged in a "persistent course of conduct in West Virginia which violated" controlled substance laws. (JA145). Despite their knowledge of the prescription abuse problem,[1] the Complaint alleges the distributors "willfully turned a blind eye towards the actual facts by regularly distributing large quantities of controlled substances to customers who are serving a customer base comprised of individuals who are themselves abusing prescription medications, many of whom are addicted and all of whom can reasonably expect to become addicted." (JA149)

The Complaint describes in detail an illegal scheme fueling West Virginia "pill mills" purportedly carried out by J M Smith and its codefendants. According to the Complaint, the defendants "willfully and repeatedly" flouted the State's Controlled Substance Act by failing to "provide effective controls and procedures to guard against . . . diversion of controlled substances" and failing properly to inform West Virginia of "orders of unusual size, orders deviating substantially from a normal pattern, and orders of unusual frequency." (JA146-147)

---

[1] The Complaint alleges that the defendants, including J M Smith, were "on notice of the growing epidemic from the abuse of those prescription drugs which they supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia." (JA140). The Complaint alleges there was "an inordinate amount of media coverage by both local and national print, television and radio media," in addition to publications in both government sources as well as warnings and recommendations in journals. (JA152)

West Virginia pleads eight causes of action, with each cumulatively incorporating all earlier factual allegations:

- Injunctive relief to halt the defendants' "willful[] and repeated[] violat[ions] [of] the Uniform Controlled Substances Act and corresponding regulations." (JA145-47) (Count I).
- "[N]egligence and violations" of the Uniform Controlled Substances Act, incorporating allegations of the defendants' "willful[] and repeated[] violat[ions] [of] the Uniform Controlled Substances Act," stating that defendants "willfully turned a blind eye toward the actual facts" at issue. (JA148-49) (Count II).
- Violations ("repeated . . . and . . . willful") of the State's Consumer Credit and Protection Act, unfair competition, or unfair or deceptive acts or practices, again based on the alleged violations of the Uniform Controlled Substances Act.  (JA150-51) (Count III).
- Public nuisance, based on allegations defendants were on notice that an epidemic from prescription drug abuse existed and acted with blind indifference to the facts.  (JA152-53) (Count IV).
- Unjust enrichment based on all prior allegations, the damages alleged by the State and the unjust enrichment from the defendants' failure to distribute drugs only for proper purposes.  (JA154) (Count V).
- "Negligence," based on all prior allegations, including those of knowing misconduct.  (JA155-56) (Count VI).
- Medical monitoring, and a requested court-supervised fund for such monitoring, based on the above-described conduct of the defendants. (JA156-58) (Count VII).
- Violations of the West Virginia Antitrust Act, based on allegations that the distributors "conspired" with "'pill mill' physicians and pharmacies who prescribe and fill these prescriptions for non-legitimate medicine purposes in order to restrain and monopolize trade in West Virginia for the 'pill mill' market." (JA158-59) (Count VII).

All of the counts in the Complaint, including those using the word

- 5 -

"negligence," incorporate allegations of willful misconduct based upon, inter alia, violations of controlled substance laws, as well as allegations of persistent acts in conscious disregard of the epidemic of drug abuse in West Virginia.

## II.    THE LIBERTY MUTUAL POLICIES.

Liberty Mutual has issued commercial general liability insurance policies to J M Smith since July 1, 2000 (collectively, the "Policies").  Each of the Policies provides, subject to their terms, conditions, and exclusions, that Liberty Mutual "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies." [2]  (*E.g.*, JA117) Coverage is afforded for the insured's liability because of "property damage" or "bodily injury" which is caused by an "occurrence," a term defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*E.g.*, JA117 and JA130).

After receiving notice of the West Virginia Action, Liberty Mutual reserved its right to deny coverage and notified J M Smith that it intended to seek a declaratory judgment to determine its rights and duties under the Policies.  (JA223) Liberty Mutual has funded the defense of J M Smith in the West Virginia Action reserving its rights, pending court guidance on its duty to defend and

---

[2] Because the Policies generally contain the same language relevant to this dispute, the parties include the complete copy of one policy in the Joint Appendix.

indemnify. (JA332)

## SUMMARY OF ARGUMENT

The West Virginia "pill mill" suit does not fall within Liberty Mutual's coverage,  It does not allege an accident or "occurrence." Further, West Virginia seeks to recover uninsured economic losses from the prescription drug epidemic.

*First*, West Virginia alleges harm that was the natural result of intentional, willful conduct—not an accident or "occurrence." The court below apparently concluded that the use of the phrase "should have known" in certain sections of the Complaint necessarily alleged negligent conduct and triggered coverage.  But, under South Carolina law, if counts of a complaint incorporate allegations of intentional conduct factually incompatible with negligence, they do not allege an "occurrence" for coverage purposes, even if the count is labeled "negligence" or uses the phrase "should have known."

*Second*, even if the Complaint could be read to allege negligent conduct, injury caused by the insured's negligence is not an "accident" under South Carolina law if the loss is a "natural and probable consequence," or a "normal" consequence, of the insured's persistent and continuous alleged negligent acts. The district court held that "creating a pill mill with widespread addiction, cannot be said to be a *normal* consequence of distributing prescription drugs to three pharmacies in a state over a limited time."  (JA339).  However, the Complaint

alleges that, while on notice of the West Virginia prescription drug epidemic, J M Smith engaged in a "persistent course of conduct" in which it "willfully" violated West Virginia's controlled substance laws. (JA145). These laws were tailored "specifically to address the growing problem of prescription drug abuse." (JA152). It follows that persistent and willful violations of these laws would lead to the natural and probable result of fueling West Virginia's epidemic of prescription drug abuse and its costs.

*Third*, the court below erred as a matter of law by substituting extrinsic evidence for the actual allegations of the West Virginia Complaint in determining Liberty Mutual's duty to defend. The text of the Complaint states that the defendants "willfully and repeatedly" and "persistently" violated West Virginia law, allegedly with "a blind indifference to the facts." (JA147, 152). Under South Carolina law, extrinsic evidence is admissible to evaluate an insurer's duty to defend only in limited circumstances, where the evidence does not contradict core factual allegations of the complaint.

*Finally*, even if West Virginia did allege an "occurrence"—which Liberty Mutual strenuously disputes—the Policies provide coverage only for the insured's liability for damages because of "bodily injury" or "property damage" caused by an "occurrence." Here, the State of West Virginia seeks recovery for economic

harm, not insured bodily injury or property damage.  For this independent reason,

Liberty Mutual also owes no coverage for West Virginia's "pill mill" suit.

## ARGUMENT

### I.    STANDARD OF REVIEW

This Court reviews *de novo* the district court's summary judgment ruling

under Fed. R. Civ. P. 56.  *E.g.*, *AT&T Wireless PCS, Inc. v. Winston-Salem Zoning*

*Bd. of Adjustment*, 172 F.3d 307, 312 (4th Cir. 1999).  Summary judgment should

be upheld only if the movant can show that "there is no genuine dispute as to any

material fact and that [it] is entitled to judgment as a matter of law."  Fed. R. Civ.

P. 56; *see also, e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986);

*Monahan v. County of Chesterfield*, 95 F.3d 1263, 1265 (4th Cir. 1996).

As this matter was presented to the District Court for the District of South

Carolina pursuant to that court's diversity jurisdiction, this Court must apply South

Carolina's substantive law.  *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

Under S.C. Code Ann. § 38-61-10,  South Carolina law applies to this dispute

because J M Smith, a South Carolina company, procured the Policies from Liberty

Mutual via South Carolina offices.

In determining whether an insurer owes a duty to defend, the insured bears

the burden of showing that a claim is covered.  *Auto-Owners Ins. Co. v. Madison at*

*Park W. Prop. Owners Ass'n*, 834 F. Supp. 2d 437, 443 (D.S.C. 2011).  Further,

South Carolina law requires this Court to apply the "well settled" rule that the insurer's duty to defend is determined by "the allegations of the [underlying] complaint." *E.g.*, *Allstate Ins. Co. v. Wilson*, 193 S.E.2d 527, 591 (S.C. 1972) (quoting *Hartford Accident & Indem. Co. v. S. Carolina Ins. Co.*, 166 S.E.2d 762, 764 (S.C. 1969)).

"In examining a complaint when conducting the duty-to-defend inquiry, a court must look beyond the labels describing the acts [in the complaint] to the acts themselves [described in the complaint] which form the basis of the claim against the insurer." *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 666 S.E.2d 897, 899 (S.C. 2008). This analysis involves "the allegations of the complaint and not the specifically identified causes of action." *Graphic Arts Mut. Ins. Co. v. Caldwell Chevrolet, Inc.*, No. 0:11-cv-01255, 2012 WL 3962752, at *4 (D.S.C. Sept. 11, 2012).

## II.    WEST VIRGINIA'S "PILL MILL" COMPLAINT DID NOT ALLEGE A COVERED "OCCURRENCE"

Liberty Mutual's duty to defend J M Smith under the Policies is only triggered if the West Virginia Action alleges a covered "occurrence." It does not. The Complaint alleges intentional conduct incompatible with mere negligence, and alleges harm which is the natural and probable result of the acts described.

### A.    West Virginia Alleges Conduct Incompatible with Mere Negligence.

1.    The Complaint Alleges Intentional, Illegal Conduct Factually
Incompatible With "Negligence," Not An Accidental "Occurrence."

Under the Policies, an "occurrence" is an "accident."  (*E.g.*, JA130)

"Accident" is not defined in the Policies; under South Carolina law, "in the

absence of a prescribed definition in the policy, the definition of 'accident' is '[a]n

unexpected happening or event, which occurs by chance and usually suddenly,

with harmful result, not intended or designed by the person suffering the harm or

hurt.'" *Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541, 543 (S.C. 2009).  Thus,

where a defendant is alleged to have known that its actions will result in harm,

there is no "accident" under the policies.  *Collins*, 666 S.E.2d at 900.

2.    Coverage Is Not Created By Labeling Willful, Intentional Conduct
Negligence.

This analysis requires that a court "look beyond the labels" of the causes of

action.  *Collins*, 666 S.E.2d at 899.  Under South Carolina law, therefore, the mere

inclusion of a "negligence" cause of action or the "use of the phrase 'should have

known' in [an] [u]nderlying [c]omplaint" is not sufficient to invoke coverage.

*MCE Auto., Inc. v. Nat'l Cas. Co.*, 6:11-cv-01245, 2012 WL 4479163, at *5

(D.S.C. 2012), *aff'd*, 535 Fed. App'x 303 (4th Cir. 2013).  In "look[ing] beyond

the labels" of the causes of action, South Carolina courts specifically look to the

allegations incorporated into each cause of action, not merely to the words used in

the titles of those causes of action or rote formulations of negligence.

- 11 -

As the district court acknowledged, the West Virginia Complaint alleges that J M Smith "willfully and repeatedly" violated West Virginia's drug laws. (JA147) The district court also acknowledged, correctly, that the reviewing court must look beyond the specific labels attached to the counts in the complaint in determining the duty to defend. (JA338). However, court below believed that the use of the phrase "should have known" in one paragraph of the complaint was sufficient to allege an accidental "occurrence." (*Id.*) South Carolina law is clear—"the use of the phrase 'should have known' . . . do[es] not invoke coverage" when factual allegations of intentional conduct are "specifically incorporated into the . . . cause of action." *MCE Auto.*, 2012 WL 4479163, at *4. If a negligence count in a complaint incorporates allegations of intentional conduct, the count does not allege an "accident" for purposes of analyzing coverage. *See Mfrs and Merchants Mut. Ins. Co. v. Harvey*, 498 S.E.2d 222, 228 (S.C. Ct. App. 1998) ("The Appellants cannot assert that [the insureds] committed intentional acts, incorporate these intentional acts into each cause of action, and then seek recovery based on a negligence theory.); *Collins*, 666 S.E.2d at 900 ("[B]ecause the negligent misrepresentation claim incorporates the same facts and does not allege an 'occurrence,' . . . this cause of action did not trigger [the] Insurance Company's duty to defend," even though the negligence claim used the phrase "should have known"); *MCE Auto., Inc.*, 2012 WL 4479163, at *4 ("These factual allegations

- 12 -

[of intentional misconduct] are specifically incorporated into the negligence cause of action alleged in the Underlying Complaint.").  This is the case *even if* the complaint uses terms such as "negligence" or "should have known."  *See MCE Auto., Inc.*, 2012 WL 4479163, at *4; *see also Harvey*, 498 S.E.2d at 227 ("While alternative pleading is permitted in South Carolina, parties may not attempt to invoke coverage by couching intentional acts in negligence terms.").

> 3.    The South Carolina Supreme Court's Ruling in *Collins* Controls This Case

The South Carolina Supreme Court's ruling in *Collins* is directly on point. In that case, a casino sought coverage for a suit alleging that it fostered gambling addiction by operating its gaming machines illegally.  666 S.E.2d 897 (S.C. 2008). Interpreting policy language identical to that in the Liberty Mutual Policies, the court held that all counts of the complaint were based upon the same language: that the insured purportedly "systematically violated South Carolina laws specifically enacted to protect the public from excessive gambling losses."  *Id.* at 899.  As the South Carolina high court held, because the allegations "constitute[d] intentional, deliberate, and illegal acts," such conduct could not "be construed as accidental in nature."  *Id.*  This was the case even though the complaint alleged a "negligent misrepresentation" count and used the phrase "should have known."  *Id.*

Here, J M Smith seeks coverage for a suit alleging it fostered prescription drug abuse by distributing its drugs in violation of controlled substances laws.

- 13 -

Each count of West Virginia's Complaint incorporates allegations that J M Smith and other defendants were "on notice of the growing epidemic from the abuse of those prescription drugs which they supplied," that they "tortiously caused injuries in West Virginia by engaging in a persistent course of conduct in West Virginia which violated West Virginia law," and that they "violated West Virginia statutes and regulations which govern controlled substances." (JA141).[3]  As such, each count is based on allegations that the insured "systematically violated South Carolina laws specifically enacted to protect the public from [controlled substance abuse]."[4]  *Collins*, 666 S.E.2d at 899.  Further, the so-called "negligence" counts also incorporate allegations that J M Smith "willfully" violated the Controlled Substances Act.  (JA148, 155).  Where "[e]ven the sections entitled 'Negligen[ce] . . . assert intentional acts of willful, deliberate misconduct,'" South Carolina courts

_____

[3] The district court relied on Count IV, the public "nuisance" count, in finding a duty to defend.  It incorporates earlier allegations of intentional conduct that are incompatible with negligence, as do Counts II and VI.  (JA148, 152, 155)

[4] The district court sought to distinguish *Collins* on the grounds that distributing prescription drugs is "not, in and of itself, illegal" whereas Collins "intentionally paid and advertised an *illegal* payout." (JA340)  But, as the court conceded earlier in its opinion, West Virginia alleges illegal conduct through willful, repeated violation of the Uniform Controlled Substances Act while turning a blind eye to the abuse that law specifically was designed to combat.  (*Id.*)  It is this illegal conduct that is the basis of the West Virginia Complaint—not the mere fact that J M Smith distributed prescription drugs.

- 14 -

do not find coverage. *Harvey*, 498 S.E.2d at 227. Thus, the conduct, as alleged, was no "accident"—and as a matter of South Carolina law, the West Virginia Action does not allege an "occurrence."

> 4.    Numerous Decisions from Other Jurisdictions Support South
>        Carolina Law In Finding That Allegations Such As The West
>        Virginia "Pill Mill" Claims Do Not Allege An Occurrence.

South Carolina law is in accord with numerous other jurisdictions—where a complaint alleges intentional conduct that is incompatible with negligence, there is no covered "occurrence." For example, in *Adolph Coors Co. v. Truck Insurance Exchange*, an alcohol distributor sought coverage for class action suits alleging that its marketing and distribution practices fostered underage drinking. 960 A.2d 617 (D.C. 2008) (Colorado law). Even though the complaint included an explicit count for "negligence," the court found that it was not "even 'arguable' that the . . . plaintiffs sought relief on account of injuries that, from [the insured's] perspective were unexpected or unintended." Thus, there was no covered "occurrence." *Id.* at 624. Strikingly, the allegations found dispositive in *Adolph Coors Co.* are essentially duplicated in the West Virginia Action. According to the *Adolph Coors Co.* complaint, alcoholic beverages are "unusually dangerous products" and the insured "employed a long-running and sophisticated scheme 'to market alcoholic beverages to children' despite the common knowledge that underage drinking is dangerous." *Id.* at 625. The West Virginia Complaint alleges that J M Smith

- 15 -

"persistently engaged in a pattern of distributing controlled substances of this kind[,] which were well-known to be abused and diverted."  (JA152)

In a similar example, an Illinois gun distributor sought coverage for a suit involving the distributor's sales practices.  *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 765 N.E.2d 1152 (Ill. App. Ct. 2002).  The complaint contained counts for negligent entrustment and public nuisance, alleging that the distributor's sales practices facilitated violations of city ordinances and contributed to physical harm.  And, as in *Collins* and *Adolph Coors*, the court affirmed that the plaintiffs had not alleged an "occurrence" even though the complaint contained counts for negligence.  The complaint in *Midwest Sporting Goods* alleged that the gun distributor "knew, at least from ATF reports, that substantial numbers of guns it sold found their way to an illegal resale market and into the hands of criminals."  *Id.* at 1158.  The court held that "expected result of [the insured's] pattern of sales practices cannot qualify as an accident." *Id.* at 1160. J M Smith, similarly, is alleged to have actively "participated in" the pill mill enterprise despite being "on notice' of "the growing epidemic from the abuse of those prescription drugs which they supplied and of the quantities and frequency with which those drugs were distributed to entities in West Virginia."  (JA140)

**B.    Persistent, Knowing and Willful Violations of Statutes Designed to Combat An Epidemic of Prescription Drug Abuse Are Not An "Occurrence"**

- 16 -

1.    The Harm At Issue Is The Normal Consequence of Illegally
Distributing Prescription Drugs In Violation of Controlled Substance
Laws.

As previously discussed, the West Virginia Complaint cannot be stretched to

support the theory that J M Smith's actions were mere negligence, not intentional

conduct.  However, even if it described mere negligent conduct, the harm caused

by these acts was no accident.

2.    Normal Consequences Are Not An Accident.

In the words of this Court, insurance does not cover liability where the "acts

which caused the damage were persistently and continuously done and the results

were the normal consequences[5] of the acts."  *C.Y. Thomason Co. v. Lumbermens

Mut. Cas. Co.*, 183 F.2d 729, 733 (4th Cir. 1950) (applying South Carolina law).

Thus, under South Carolina law, "it cannot be held that negligence is synonymous

with accident."  *Id.*  Only an "effect which does not ordinarily follow and cannot

be reasonably anticipated from the use of these means, an effect which the actor

did not intend to produce and cannot be charged with producing . . . is produced by

accidental means."  *Ducker v. Cent. Sur & Ins. Co.*, 107 S.E.2d 342, 343 (S.C.

1959); *see State Farm Fire & Cas. Ins. Co. v. Reed*, No. 07-2958, 2009 WL

735133, at *5 n.2 (D.S.C. Mar. 19, 2009) ("[T]he Supreme Court of South

_____

[5] The more common formulation of the phrase "normal consequences" is "natural
and probable consequences."  This brief will use the two phrases interchangeably.

Carolina has long held that '[o]ne is presumed to intend the natural and probable consequences of his voluntary acts.'"); *accord AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 532, 538 (Va. 2012) ("Where the harmful consequences of an act are alleged to have been . . . the natural and probable consequences of an intentional act, choosing to perform the act deliberately, even if in ignorance of that fact, does not make the resulting injury an 'accident' even when the complaint alleges that such action was negligent."). This standard is an objective one. *See Baker v. Am. Ins. Co. of Newark, N.J.*, 324 F.2d 748, 751 (4th Cir. 1963) (the objective standard is "essentially the concept of an accident adopted by the Supreme Court of South Carolina").

### 3. The Action Alleges Persistent Violations of Laws Specifically Enacted to Combat Prescription Drug Abuse.

Here, the court below erroneously held that "creating a pill mill with widespread addiction . . . cannot be said to be a *normal* consequence of distributing prescription drugs . . ." (JA339) This conclusion does not properly consider the actual, detailed allegations of the West Virginia Complaint. West Virginia explicitly alleges that J M Smith, while on notice of the growing epidemic from the abuse of prescription drugs that it supplied (JA140), distributed prescription drugs *in repeated violation of controlled substance laws*—laws enacted specifically to

- 18 -

combat the prescription drug abuse problem.[6]  According to the Complaint, the

drugs distributed by defendants were "well-known to be abused and diverted."[7]

(JA152).  West Virginia's controlled substance laws were specifically tailored to

prevent the growing problem of prescription drug abuse.  It follows that the costs

and harms of drug abuse are normal, expected consequences of persistent

violations of West Virginia's controlled substance laws.

     Because the harm at issue was alleged to be the normal consequence of J M

Smith's acts described in the Complaint,[8]  there is no covered "occurrence."  *Id.*;

*see also Reed*, 2009 WL 735133, at *5 n.2 ("[I]n the context of negligence, the

---

[6] The Complaint alleges that J M Smith alleged in a "persistent course of conduct in West Virginia which violated West Virginia law."  (JA145)  This alleged scheme involved a "fail[ure] to diligently respond to suspicious orders which the Defendants have filed . . . [and] to provide effective controls and procedures to guard against diversion of controlled substances in contravention of West Virginia law."  (JA147).

[7] This widespread public knowledge was the result of "[a]n inordinate amount of media coverage" in West Virginia and nationally, "[p]ublications received from government sources as well as warnings and recommendations in trade and professional journals," and "[c]hanges in law and regulations which were designed specifically to address the growing problem of prescription drug abuse."  (JA152).

[8] According to the West Virginia Complaint, J M Smith and the other defendants had "knowledge of this epidemic,"  (JA152)  and the risk that widespread drug abuse might result from their alleged conduct is the "normal consequence[]"of "persistently and continuously" flooding West Virginia with controlled substances. *C.Y. Thomason*, 183 F.2d at 733.

- 19 -

Supreme Court of South Carolina has long held that '[o]ne is presumed to intend the natural and probable consequences of his voluntary acts.'" (quoting *Yaun v. Baldridge*, 134 S.E.2d 248, 251 (S.C. 1964))).  And because this inquiry is an objective one, J M Smith's alleged subjective unawareness of the resultant harm in West Virginia is irrelevant—what matters is that the Complaint alleges that J M Smith as an objective matter "should have known that these substances were not being prescribed and consumed for legitimate medical purposes." [9] (JA152).  The natural and probable consequence of its actions was the harm alleged.

   *State Farm Fire & Casualty Co. v. Tran* recently held that addiction was the normal consequence of dispensing drugs in violation of controlled substance laws under similar circumstances to those presented here.  No 1:10-CV-00469, slip op. at 3 (S.D. Miss. Aug. 20, 2012).  In *Tran*, a pharmacist sought coverage for a suit alleging he dispensed controlled substances without proper monitoring and without regard to the "dangerous volume of drugs" he was dispensing.  *Id.*  Although the complaints, as here, "assert[ed] claims of negligence," the court found that the complaints "describe[d] [only] intentional conduct that caused foreseeable injuries."  *Id.* at 8.  In the words of the court, "[t]he alleged excessive distribution of highly addictive controlled substances to individuals cannot be considered an

---

[9] *See Baker v. Am. Ins. Co. of Newark, NJ*, 324 F.2d at 721.

'accident' . . . ." *Id.* at 10. Here, the systemic harm from the persistent pattern of violations alleged by West Virginia is even further from a covered occurrence than the discrete injuries alleged in *Tran*.

4.    Extrinsic Materials Cannot Be Substituted For the Complaint's Actual Allegations In Determining a Duty to Defend

This Court should reverse the decision below for the additional reason that the district court improperly substituted extrinsic evidence for the Complaint's actual allegations in evaluating Liberty Mutual's duty to defend.  Relying on an affidavit submitted by J M Smith concerning the number of pharmacies it serviced in the state at the relevant times, the court below stated that "the results in this case, creating a pill mill with widespread addiction, cannot be said to be a *normal* consequence of distributing prescription drugs to three pharmacies in a state over a limited time".  (JA339).[10]  But the West Virginia Complaint alleges "repeated and willful"  "persistent" conduct in violation of West Virginia law, taken "with a blind indifference to the facts."  (JA152).  The district court thus erroneously relied on an affidavit submitted by J M Smith, rather than the actual claims asserted by West Virginia, in evaluating Liberty Mutual's coverage obligations.  Under South

_____

[10] Drawing from the same extrinsic materials, the district court accepted J M Smith's contention that "the violation of laws cannot be reasonably anticipated – especially as to J M Smith, which had been distributing prescription drugs in West Virginia for only a short time and to only three pharmacies."  (JA340)

Carolina law, it "[i]s well settled that an insurer's duty to defend is based on the allegations of the underlying complaint," not the insured's competing version of those allegations. *B.L.G. Enters., Inc. v. First Fin. Ins. Co.*, 514 S.E.2d 327, 330 (S.C. 1999). Under South Carolina law, extrinsic evidence may only be considered in evaluating an insurer's duty to defend in limited circumstances[11] where the facts are both known to the insurer at the time of its coverage determination and do not contradict the complaint, and it is error to "consider[] factual allegations . . . that [are] not part of the [underlying] Complaints" when "based solely on the allegations in [the] Complaints, the . . . policy [does] not provide coverage." *USAA Prop & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 797 (S.C. 2008).

In the West Virginia Action, J M Smith may well prove that it did not perform the acts alleged in the Complaint and that it did not violate West Virginia law.  Such a possibility exists in any claim submitted for insurance coverage.  But this Court's duty is to determine whether the allegations in the complaint allege an "occurrence," not to evaluate whether J M Smith may disprove them.  And "[i]f the

---

[11] These limited circumstances are most commonly present "when the duty to defend depends on a factual issue which will not be resolved by the trial of the third party's suit against the insured."  1 Alan D. Windt, Insurance Claims & Disputes: Representation of Insurance Companies & Insureds, § 4:4 (5th ed.).  Such circumstances are not present here, as J M Smith's culpability will be determined in the West Virginia Action.

- 22 -

facts *alleged in a complaint* against an insured fail to bring a claim within policy coverage[,] then an insurer has no duty to defend." *Shelby Mut. Ins. Co. v. Askins*, 413 S.E.2d 855, 859 (S.C. Ct. App. 1992) (emphasis added).

If an insured could raise the possibility of coverage simply by submitting an affidavit challenging certain allegations in the complaint, there would be no limit to an insurer's duty to defend. This would turn duty-to-defend actions into a second forum for litigating the merits of the underlying action. This is not the law in South Carolina. *See, e.g.*, *Am. S. Ins. Co. v. Conniff*, No. 2:09-CV-01965, 2010 WL 2710568, at *3 (D.S.C. July 7, 2010) ("[A]lthough the duty to defend may also be determined by facts outside the complaint that are known by the insurer, the court . . . will not be presented any issues that may be before the state court . . . ."); *accord Minn. Lawyers Mut. Ins. Co. v. Antonelli, Terry, Stout & Kraus, LLP*, 355 F. App'x 698, 701-02 (4th Cir. 2009) (Virginia law). As a result, it was error to rely on J M Smith's affidavit, rather than the allegations in the Complaint, to determine Liberty Mutual's duty to defend.

### III.  LIBERTY MUTUAL HAS NO DUTY TO DEFEND FOR THE ADDITIONAL REASON THAT WEST VIRGINIA SEEKS TO RECOVER DUE TO ECONOMIC COSTS, NOT BODILY INJURY OR PROPERTY DAMAGE.

#### A.  Claims For Economic Loss Do Not Seek Damages Because Of "Bodily Injury" or "Property Damage."

The district court granted summary judgment to J M Smith and found that

- 23 -

"Liberty Mutual has a duty to defend."  (JA340)  However, even if West Virginia

somehow alleged an "occurrence"—which Liberty Mutual strenuously disputes—

J M Smith does not face liability for damages because of insured "property

damage" or "bodily injury." [12]

> 1.    The West Virginia Action Concerns the State's Economic Losses.

Here, the West Virginia Action seeks to recover damages because of

economic harm, not for "bodily injury" or "properly damage."  As the opening

statements in the West Virginia Complaint make clear, "[t]his civil action

addresses the epidemic of prescription drug abuse and its costs.  Prescription drug

abuse costs the State of West Virginia hundreds of millions of dollars annually."

(JA140)  These are the State's own words in describing the basis for its suit.

The crux of the Complaint is the economic cost to the State and its concern

that "[p]rescription drug abuse adversely affects West Virginia's hospitals, schools,

events, social service agencies, jails and prisons as well as diminishing the very

quality of life in our cities and towns." (JA140)  To recover its economic losses,

"the State, by its Attorney General, brings this action against parties whom the

---

[12]    Liberty Mutual specifically preserved this issue and noted that West
Virginia's complaint obviously does not allege "bodily injury."  (JA321 at 24:5-12
("MS. FOGGAN: . . . Liberty Mutual has specifically raised that point [whether the
complaint seeks damages for "bodily injury"] and reserved on it in its complaint
and in its motion papers here . . .")).

Attorney General has identified as having substantially contributing [sic] to and who have substantially, illicitly, and tortiously benefited financially from the prescription drug abuse problem in West Virginia."  (JA140)

As this Court has recognized, "potential liability for economic loss independent of any liability for personal injury or property damage is relatively indeterminate and therefore difficult to insure."  *Indus. Enters., Inc. v. Penn Am. Ins. Co.*, 637 F.3d 481, 489 (4th Cir. 2011) (Maryland law) (citation and internal quotation marks omitted).  In *Industrial Enterprises*, the government's demand was not for cleanup of the government's property, but rather was "regulatory liability for response costs."  *Id.* at 488.  This Court held that "the term 'property damage' in the standard CGL policy, which referred to risks of tort damage, was not meant to insure against this form of regulation."  That decision was in accord with well-established law in South Carolina and elsewhere—that CGL policies are not designed to cover claims for economic losses.  *Auto Owners Ins. Co., Inc. v. Newman*, 684 S.E.2d 541, 544 (S.C. 2009) (citing *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318, 320 (S.C. Ct. App. 1994)).[13]  This same

---

[13] *See also Diamond State Ins. Co. v. Chester-Jensen Co, Inc.*, 611 N.E.2d 1083, 1088 (Ill. App. Ct. 1993) (even though economic claims as a result of decreased productivity were caused by employees' illness, such claims were not for "bodily injury"); *Health Care Indus. Liab. Ins. Program v. Momence Meadows Nursing Ctr., Inc.*, 566 F.3d 689, 694-95 (7th Cir. 2009)(mere allegations of bodily injury insufficient to trigger duty to defend if damages are not sought *because of* bodily injury).

- 25 -

rationale also applies here, where the State of West Virginia seeks to recover for

expenditures to address the prescription drug epidemic and has not suffered

"property damage" [14] or "bodily injury."[15]

A similar issue arose in *Steadfast Ins. Co. v. Purdue Federick Co.*,

X08CV020191697S, 2006 WL 1149202 (Conn. Super. Ct. Apr. 10, 2006). In that

case, a drug manufacturer allegedly "inappropriately marketed OxyContin to

obtain a preeminent position in the pain killer medication market." *Id.* at *2. The

complaint alleged that this caused OxyContin users to become addicted to it,

spurning an "epidemic—that of drug addiction." *Id.* The policyholder urged that

the underlying suits "would not arise except for the addiction alleged in each suit

and the ramifications of the alleged addictions." *Id.* However, there was no

"evidence in the above pleadings to indicate even the possibility that the plaintiffs

seek damages 'because of bodily injury.'" *Id.* at 3. Rather, the complaint sought

to "compensate for allegedly wrongful marketing and promotional activities, not

bodily injury."

Similarly, in *Medmarc Cas. Ins. Co. v. Avent America, Inc.*, 612 F.3d 607

(7th Cir. 2010), the Seventh Circuit found no coverage for a suit against the

---

[14] The Policies define "property damage" to include, in relevant part, "[p]hysical injury to tangible property, including all resulting loss of use of that property" and "[l]oss of use of tangible property that is not physically injured." (JA131)

[15] The Policies define bodily injury as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (JA129)

- 26 -

manufacturer of plastic baby bottles containing Bisphenol A ("BPA"), which alleged that BPA exposure could cause increased health risks—but did not seek damages due to actual bodily injury or property damage. *Id.* at 609-610. The suits alleged that the underlying plaintiffs incurred "purely economic damage" caused by the purchase of the products. *Id.* at 613-14. The Seventh Circuit thus held as a matter of law that the insurer had no duty to defend. *Id.* at 615.[16]

### 2. Referring to Bodily Injury Does Not Create Coverage In a Case About Economic Loss.

To the extent West Virginia's Complaint does discuss bodily injury caused as a result of drug addiction, this does not create coverage. As a leading insurance treatise states, "it is not enough that the complaint refers to bodily injury or property damage. The complaint must be seeking compensation for such injury [or] damage." 3 Allan D. Windt, Insurance Claims and Disputes § 11:2 (6th ed.). West Virginia seeks relief because of economic expenditures by the State, not bodily injury.[17]  (JA140)  As this Court has stated, CGL policies are meant to

---

[16] *See also Zurich-Am. Ins. Co. v. Audiovox Corp.*, 741 N.Y.S.2d 692 (App. Div. 2002); *TIG v. Andrews Sporting Goods, Inc.*, No. 8153587, 2002 Cal. App. LEXIS 2105, at *10-11 (Cal. Ct. App. June 12, 2002).

[17] In the court below, JM Smith attempted to stretch the plain language of the policies by suggesting "bodily injury" is at issue to the extent the complaint references medical monitoring.  However, here West Virginia is not seeking to remediate future bodily injury because of its own exposure to a harmful substance. Instead, it contends that it should be compensated for economic claims.  Moreover, even when a tort plaintiff who was directly exposed to a harmful agent seeks such recovery, courts are divided on whether medical monitoring claims trigger bodily injury coverage. *See, e.g.*, *HPF, LLC v. Gen. Star Indem. Co.*, 788 N.E.2d 753,

protect against liability for damages caused by actual bodily injury or property

damage, not due to the economic and regulatory expenditures of a state

government.  *Cf. Indus. Enters.*, 637 F.3d at 489.

## IV. LIBERTY MUTUAL IS ALSO ENTITLED TO SUMMARY JUDGMENT ON ITS DUTY TO INDEMNIFY AND CONTRACT CLAIMS.

For the reasons discussed above, Liberty Mutual owes no duty to defend J M

Smith in the West Virginia Action; because it owes no duty to defend J M Smith, it

also owes it no duty to indemnify.  *See, e.g.*, *Union Ins. Co. v. Soleil Grp., Inc.*,

465 F. Supp. 2d 567, 575 n.3 (D.S.C. 2006); *see also* JA360 (directing partial final

judgment pursuant to Rule 54(b) in part because "a favorable appellate ruling for

Liberty Mutual on the duty to defend would moot the remaining issue, the

indemnification issue.").  Accordingly, Liberty Mutual is entitled to summary

judgment regarding its duty to indemnify.  Similarly, Liberty Mutual is entitled to

summary judgment on J M Smith's mirror counterclaims for declaratory judgment

and on its claim for breach of contract.  *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v.

Arnold*, 276 F. Supp. 765, 766 n.1 (D.S.C. 1967) (if "there is no coverage under the

policy, there can be no recovery for breach of contract").

757-58 (Ill. App. Ct. 2003) (where relief sought was for medical monitoring and
not for actual sickness or injury, the claims did not meet the policies' bodily injury
requirement). And, in any event, medical monitoring does not fall within the
Liberty Mutual Policies' definition of bodily injury, which is "bodily injury,
sickness or disease sustained by a person . . ." (JA129)

## V.    ENFORCING THE POLICY AS WRITTEN IS IMPORTANT TO THE INSURANCE SYSTEM.

Finding coverage for West Virginia's Complaint would require this Court to ignore, rather than give effect to, the plain language of the policies. This would undermine the certainty and predictability necessary to the proper functioning of the insurance system.

An insurance contract expresses an insurer's agreement to accept, in return for a premium, a bounded and defined risk. The assumed risks of multiple policyholders are covered out of the pool of assets generated from the premiums. Thus, a viable insurance system requires that an insurer know at the outset of the policy relationship what risks are assumed.

Expanding coverage to include suits that do not allege an "occurrence" or claims other than those seeking to impose liability for actual bodily injury or property damage undermines the risk-for-premium exchange. The underwriters' estimation of exposure becomes meaningless, if exposure for which the insurer has calculated the risk is extended to encompass all suits over economic costs incurred by others, without regard to whether a suit alleges liability because of the complainant's actual bodily injury or property damage. Under such circumstances, risk calculation becomes next to impossible.

In *Pennsylvania National Mutual Casualty Insurance Co. v. Roberts*, 668 F.3d 106 (4th Cir. 2012), this Court emphasized the dangers of "holding an

insurance company liable for risks for which it never contracted and for which it never received premiums." If an insurance company cannot limit its risk through policy definitions and terms, "it will be unable to determine the precise risks assumed under a contract, which in turn will prevent it from accurately pricing coverage." *Id.* Indeed, as the *Roberts* Court made clear, "[n]ot only will this hinder rational underwriting, but the higher premiums necessary to compensate for this rising uncertainty will be passed on to policyholders everywhere." *Id.* at 115.

## CONCLUSION

For all of the foregoing reasons, Liberty Mutual respectfully requests that this Court reverse the decision below and grant Liberty Mutual summary judgment regarding its duty to defend, duty to indemnify, and its contract claims.

## REQUEST FOR ORAL ARGUMENT

Liberty Mutual believes that oral argument would aid the Court and respectfully requests oral argument pursuant to Local Rule 34(a).

Respectfully submitted,
s/Laura A. Foggan
Laura A. Foggan
WILEY REIN LLP
1776 K Street, N.W.
Washington, D.C. 20006
(202) 719-7000
(202) 719-7049 (facsimile)

*Counsel for Appellant*
*Liberty Mutual Fire*
*Insurance Company*

January 27, 2014

- 30 -

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

[ X ] this brief contains [7,315] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

[ ] this brief uses a monospaced typeface and contains [*state the number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

[ X ] this brief has been prepared in a proportionally spaced typeface using [*Microsoft Word 2010*] in [*14pt Times New Roman*]; or

[ ] this brief has been prepared in a monospaced typeface using [*state name and version of word processing program*] with [*state number of characters per inch and name of type style*].

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of January, 2013, the foregoing

Opening Brief of Appellant Liberty Mutual Fire Insurance Company was filed

electronically using the Court's CM/ECF system, which will send notification of

such filing to:

Robert M. Barrett                       George A. Tsougarakis
Perry D. Boulier                        HUGHES, HUBBARD & REED
Vollie C. Bailey, IV                    One Battery Park Plaza
HOLCOMBE BOMAR, PA                      New York, NY 10004
100 Dumber St., Suite 200               Phone: (212) 837-6000
Spartanburg, SC 29306                   Fax: (212) 422-4726
Phone: (864) 594-5300                   turk@hugheshubbard.com
Fax: (864) 585-3844
pboulier@holcombebomar.com

*Counsel for Appellees J M Smith Corporation*
*and Smith Drug Company, Inc.*

I further certify that an original and eight copies of the foregoing brief were

sent, via overnight courier, to:

Clerk of the United States Court of Appeals
    for the Fourth Circuit
1100 East Main Street
Richmond, Virginia 23219-3517

                                        s/Laura A. Foggan
                                        Laura A. Foggan