RECORD NO. 13-2451

# United States Court of Appeals

*for the*

# Fourth Circuit

―――――――・――――――――

LIBERTY MUTUAL FIRE INSURANCE COMPANY,

*Plaintiff-Appellant,*

– v. –

JM SMITH CORPORATION, SMITH DRUG COMPANY, INC.,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AT SPARTANBURG

## BRIEF FOR DEFENDANTS-APPELLEES

VOLLIE CLEVELAND BAILEY, IV
ROBERT MASON BARRETT
PERRY D. BOULIER
HOLCOMBE BOMAR, P.A.
100 Dunbar Street, Suite 200
Spartanburg, South Carolina 29306
(864) 594-5300

GEORGE ANTONIOS TSOUGARAKIS
AMERA Z. CHOWHAN
TAYLOR K. HERMAN
HUGHES, HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000

*Attorneys for Defendants-Appellees*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure Rule 26.1 and Local Rule 26.1, J M Smith Corporation and Smith Drug Company, Inc. make the following disclosures:

1.    Are the parties publicly held corporations or other publicly held entities?

No.

2.    Do the parties have any parent corporations?  If yes, identify all parent corporations, including grandparent and great-grandparent corporations:

Smith Drug Company, Inc. is an operating division of J M Smith Corporation, a South Carolina corporation.  Smith Drug Company, Inc. is not separately incorporated.

J M Smith Corporation has no parent corporations.

3.    Is 10% or more of the stock of the parties owned by a publicly held corporation or other publicly held entity?

No.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

No.

5.    Are the parties a trade association?

No.

6.    Does this case arise out of a bankruptcy proceeding?

No.

# TABLE OF CONTENTS

Page(s)

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................................1

STATEMENT OF FACTS ...................................................................................1

    I.    General Background.............................................................................1

    II.    The Underlying Action........................................................................2

    III.    The Policies.........................................................................................7

    IV.    The Couch Affidavit............................................................................9

    V.    The Judgment Below.........................................................................10

SUMMARY OF ARGUMENT ...........................................................................11

ARGUMENT .....................................................................................................14

    I.    Standard of Review ...........................................................................14

    II.    The West Virginia Complaint Alleges an Occurrence, and Liberty Mutual therefore has a duty to defend...................................15

        A.    The Inclusion of Any Covered Claim Triggers the Duty to Defend the Entire Complaint. ...............................................17

        B.    The Inclusion of Language of Intent in the West Virginia Complaint Does Not Warrant Effectively Redrafting it to Assert Claims Solely For Intentional Conduct. .......................24

        C.    Widespread Addiction is Not the Natural Consequence of J M Smith's Alleged Conduct..................................................31

        D.    Extrinsic Evidence Was Not Improperly Considered by the District Court........................................................................36

    III.    J M Smith Should Not Be Denied Coverage Under the Policies' Bodily Injury Provision.....................................................................42

        A.    Liberty Mutual Has Waived the Issue of Bodily Injury. ..........42

Page(s)

B.    The West Virginia Complaint Seeks Damages Because of Bodily Injury. .................................................................45

IV.    The District Court Properly Denied Summary Judgment On The Duty to Indemnify. .................................................52

V.    Policy Considerations Favor Finding a Duty to Defend In the West Virginia Action. ...........................................53

CONCLUSION .....................................................................56

REQUEST FOR ORAL ARGUMENT ...................................56

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adolph Coors Co. v. Truck Ins. Exch.*, 960 A.2d 617 (D.C. Cir. 2008) ............25, 30

*AES Corp. v. Steadfast Ins. Co.*, 725 S.E.2d 535 (Va. 2012) .................................34

*Allstate Ins. Co. v. Best*, 728 F. Supp. 1263 (D.S.C. 1990) ....................................41

*Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541 (S.C. 2009)..............................49

*Auto-Owners Ins. Co. v. Rhodes*, 748 S.E.2d 781 (S.C. 2013)................................16

*Baker v. American Ins. Co. of Newark, N.J.*, 324 F.2d 748 (4th Cir. 1963) ...........33

*Baughman v. U.S. Liab. Ins. Co.*, 662 F. Supp. 2d 386 (D.N.J. 2009)....................51

*Berenyi, Inc. v. Landmark Am. Ins. Co.*, C.A. No. 2:09-CV-01556-PMD,
  2010 WL 233861 (D.S.C. Jan. 14, 2010) ..............................................17, 18, 54

*Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 126 F. Supp. 2d 596
  (W.D.N.Y. 2001), *aff'd in part, rev'd in part on other grounds*, 302 F.3d
  83 (2d Cir. 2002)................................................................................................51

*C.Y. Thomason v. Lumbermens Mut. Cas. Co.*, 183 F.2d 729 (4th Cir. 1950)..31, 34

*Cincinnati Ins. Co. v. Crossman Communities of N.C.*, No. 4:09-CV-1379-
  RBH, 2013 WL 1282017 (D.S.C. March 27, 2013)........................17, 18, 23, 54

*City of Carter Lake v. Aetna Cas. & Sur. Co.*, 604 F.2d 1052 (8th Cir. 1979) .......36

*City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574
  (S.C. 2009) ..............................................................................................15, 19, 53

*Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 666 S.E.2d 897
  (S.C. 2008) .................................................................................................*passim*

*Ducker v. Central Sur. & Ins. Corp.*, 107 S.E.2d 342 (S.C. 1959) ........................34

*Dunes W. Residential Gold Props., Inc. v. Essex Ins. Co.*, Nos. 06-2020, 06-
  2041, 2007 WL 4622916 (4th Cir. Dec. 28, 2007) (per curiam).......................33

*Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384 (4th Cir. 2001) ..17, 52, 54

*Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238 (4th Cir. 1995) .......................14, 19

*Gaskins v. Blue Cross-Blue Shield of S.C.*, 245 S.E.2d 598 (S.C. 1978) ...............15

*Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 765 N.E.2d
1152 (Ill. App. 2002) ...............................................................................*passim*

*Goethe v. New York Life Ins. Co.*, 190 S.E. 451 (S.C. 1937) ..................................16

*Hardeman v. City of Albuquerque*, 377 F.3d 1106 (10th Cir. 2004).......................45

*HPF, L.L.C. v. Gen. Star Indem. Co.*, 788 N.E.2d 753 (Ill. 2003) .........................52

*Industrial Enterprises, Inc. v. Penn Am. Ins. Co.*, 637 F.3d 481
(4th Cir. 2011)...............................................................................................48, 49

*Isle of Palms Pest Control Co. v. Monticello Ins. Co.*, 459 S.E.2d 318
(S.C. Ct. App. 1994) ...........................................................................................18

*Jessco Inc. v. Builders Mut. Ins. Co.*, 472 F. App'x 225
(4th Cir. 2012).............................................................................14, 15, 37, 53

*Jones v. Lib. Mut. Ins. Co. (In re Wallace & Gale Co.)*, 385 F.3d 820
(4th Cir. 2004)...............................................................................................43, 45

*Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus., Inc.*, No. 2:08-2043-MBS,
2012 WL 3292973 (D.S.C. Aug. 10, 2012), *aff'd in part and vacated in
part*, Nos. 12-2256, 12-2350, 2014 WL 504086 (4th Cir. Feb. 10, 2014) ...17, 23

*Linton v. AXA Equitable Life Ins. Co.*, 533 F. App'x 179 (4th Cir. 2013)..............15

*MCE Auto., Inc. v. Nat'l Cas. Co.*, No. 6:11-1245-TMC, 2012 WL 4479163
(D.S.C. Sept. 28, 2012), *aff'd*, 535 F. App'x 303 (4th Cir. 2013).....................30

*Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607 (7th Cir. 2010)...46, 50, 51

*Mfrs. & Merchs. Mut. Ins. Co. v. Harvey*, 498 S.E.2d 222
(S.C. Ct. App. 1998) ...............................................................................16, 30, 32

*Muth v. United States*, 1 F.3d 246 (4th Cir. 1993)...........................................42, 45

*N.A.A.C.P. v. Acusport Corp.*, 253 F. Supp. 2d 459 (E.D.N.Y. 2003)...................48

*Red Roof Inns, Inc. v. Scottsdale Ins. Co.*, 419 F. App'x 325 (4th Cir. 2011) ........14

*Scottsdale Ins. Co. v. Nat'l Shooting Sports Found.*, No. 99-316046, 2000
    WL 1029091 (5th Cir. July 11, 2000)...............................................................48

*Sentry Select Ins. Co. v. Guess Farm Equip. Inc.*, No. 5:12-03504-JMC,
    2013 WL 5797742 (D.S.C. Oct. 25, 2013) .........................................................19

*SIG Arms Inc. v. Employers Ins. of Wausau*, 122 F. Supp. 2d 255
    (D.N.H. 2000) ..............................................................................................47

*State Farm Fire & Cas. Ins. Co. v. Reed*, No. 7:07-2958-HFF 2009 WL
    735133 (D.S.C. Mar. 19, 2009) ..........................................................16, 31, 35

*State Farm Fire and Casualty Co. v. Tran*, No. 1:10CV469-LG-RHW, slip
    op. (S.D. Miss. Aug. 20, 2012).............................................................29, 35

*Steadfast Ins. Co. v. Purdue Frederick Co.*, No. X08CV020191697S, 2006
    WL 1149202 (Conn. Super. Ct. Apr. 10, 2006) .........................................49, 50

*Town of Duncan v. State Budget and Control Bd., Div. of Ins. Servs.*, 482
    S.E.2d 768 (S.C. 1997) ..........................................................................18, 23

*Union Ins. Co. v. Soleil Grp. Inc.*, 465 F. Supp. 2d 567 (D.S.C. 2006) ............18, 19

*U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926 (Ill. 1991)..........18

*United States v. Quinones*, 317 F.3d 86 (2d. Cir 2002)..........................................45

*USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791 (S.C. 2008) .................15, 37

*Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381 (4th Cir. 2013) .........14

## STATUTES AND RULES

Federal Rule of Civil Procedure 54(b)..............................................................11, 43

Local Rule 34(a)...................................................................................................56

W. Va. Code R. § 15-2-4.4 (2001).......................................................................3, 20

West Virginia Code Chapter 30 ..............................................................................32

West Virginia Code Chapter 60A .......................................................................32, 33

**OTHER AUTHORITIES**

Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes (Supp. 2011)..........................................................................................54

Leo P. Martinez, Marc S. Mayerson & Douglas R. Richmond, New Appleman Insurance Law Practice Guide (2014 ed.)............................38, 53, 54

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.    Whether the underlying complaint alleges damages caused by an "occurrence," as defined by the commercial general liability policies issued by Liberty Mutual Fire Insurance Company ("Liberty Mutual") to Appellees.

2.    Whether the lower court correctly denied summary judgment on the issue of whether Liberty Mutual has a duty to indemnify Appellees for damages arising from the underlying action.

## STATEMENT OF FACTS

## I.    GENERAL BACKGROUND

Appellee J M Smith Drug Corporation is a South Carolina corporation.  Co-appellee Smith Drug Company, Inc. is a division of J M Smith Drug Corporation and is not a separately incorporated entity (collectively hereafter "J M Smith").  (*See* JA178 ¶ 42; *supra* Corporate Disclosure Statement.)

Appellant Liberty Mutual is a Wisconsin Corporation.  (JA009 ¶ 5.) Liberty Mutual sold commercial general liability ("CGL") insurance policies to J M Smith from July 1, 2000 to the present.  (JA010 ¶ 12.)

On September 28, 2012, Liberty Mutual commenced this action by filing a complaint ("Complaint") in the United States District Court for the District of South Carolina ("District Court"), seeking declaratory judgment that it had no duty to defend or indemnify J M Smith in connection with a lawsuit brought by the Attorney General of West Virginia ("Attorney General").  (JA008-21.)

1

## II.    THE UNDERLYING ACTION

On or about June 26, 2012, the Attorney General commenced an action on behalf of the state of West Virginia in the Circuit Court of Boone County, West Virginia ("West Virginia Action"). (JA139-61.) The complaint named thirteen defendants, including J M Smith, all of which were alleged to be doing business in the state as wholesale drug distributors ("West Virginia Complaint" or "complaint"). (JA144 ¶ 8.) The Attorney General seeks damages for medical costs and other harms associated with prescription drug abuse, which the complaint described as an "epidemic" in the state. (*E.g.*, JA140 ¶ 1.)

At its core, the West Virginia Complaint seeks compensation for expenses, damages, and losses incurred because of the addiction, increased injury, and death arising from prescription drug abuse. (JA140-41 ¶¶ 3-5.) The West Virginia Complaint purports to connect the defendants' lawful acts of distributing pharmaceuticals to the illegal conduct of both licensed physicians who wrote "bogus" prescriptions and licensed pharmacists who filled them at so-called "pill mills." (*Id.* ¶¶ 3 ("These Defendants are major distributors of controlled substances who have supplied controlled substances to drugstores which then dispense controlled substances based upon bogus prescriptions from physicians who are prescribing controlled substances for illegitimate medical purposes."), 4.) But, the West Virginia Complaint contains no specific examples of any illegal

2

conduct by J M Smith, nor does it identify a single improper order distributed by

J M Smith — whose name appears only once in the body of the complaint, when it

is named as one of the defendants.  (*See* JA144 ¶ 8.)[1]  Instead, the West Virginia

Complaint largely invokes the language of negligence, alleging generally that J M

Smith and the other distributor defendants have negligently contributed to the

problem by failing to have "effective controls" in place to identify "suspicious"

orders.  (*E.g.*, JA141-47 ¶¶ 4, 16.)

The individual counts in the West Virginia Complaint are:

Count I seeks injunctive relief.  It quotes provisions of the regulations

enacted under the West Virginia Uniform Controlled Substances Act

("WVUCSA"): "'[t]he registrant shall design and operate a system to disclose to

the registrant suspicious orders of controlled substances. . . .  Suspicious orders

include orders of unusual size, orders deviating substantially from a normal

pattern, and orders of unusual frequency.'"  (JA146-47 ¶ 15 (quoting W. Va. Code

R. § 15-2-4.4 (2001)).)  The West Virginia Complaint does not describe or allege

how J M Smith's distributions were "suspicious" or how J M Smith should have

---

1. The only specific acts pled in the West Virginia Complaint relate to the intentional and illegal activities of a single pharmacy and a single physician, neither of whom are defendants, with no reference to J M Smith or any other defendants.  (*See* JA142 ¶¶ 3, 6(f)-(g).)

known they were "suspicious," nor does it allege any facts regarding J M Smith's system to disclose or respond to suspicious orders. While Count I alleges that the "[d]efendants have willfully and repeatedly violated" the law, it bases this statement on the defendants' "fail[ure] to diligently respond to suspicious orders" and "fail[ure] to provide effective controls." (JA147 ¶¶ 16-17.)

Count II is titled "Damages Resulting From Negligence and Violations of the West Virginia Uniform Controlled Substances Act." (JA148.) This count alleges that the "[d]efendants negligently acted with others to violate West Virginia's drug laws," and that "[d]efendants ha[d] by their acts and omissions proximately caused and substantially contributed to damages . . . by creating conditions which contribute to the violations of West Virginia law by others, by their negligence and reckless disregard of the customs, standards and practices within [d]efendants' own industry." (JA149 ¶¶ 26, 28.) Count II also states that "[d]efendants have wilfully turned a blind eye towards the actual facts," but fails to allege any fact or circumstance demonstrating that J M Smith acted in a manner other than negligence with respect to its distribution of prescription pharmaceuticals.

Count III alleges unfair methods of competition or unfair or deceptive acts or practices under the West Virginia Consumer Credit and Protection Act, and includes a statement that violations were "willful." However, the Count references

4

the same provisions of the WVUCSA as Count I as the basis for the deceptive acts. (*See* JA150-51 ¶¶ 34-36.)

Count IV, "Creating a Public Nuisance," states that the "[d]efendants knew or should have known that [controlled substances that were well-known to be abused] were not being prescribed and consumed for legitimate medical purposes" and alleges that the defendants acted "negligently, recklessly and/or intentionally." (JA152 ¶¶ 42-43.)

Count V is an unjust enrichment claim and references the "acts and omissions herein complained of" and states that the defendants have been enriched by "neglecting its [sic] duty of distributing drugs only for proper medical purposes." (JA154 ¶¶ 48-49.)

Count VI, titled "Negligence," alleges that the defendants breached their duty to exercise reasonable care in the distribution of controlled substances by negligently distributing large quantities in response to orders from pharmacies, and that their breach resulted in injuries to citizens of West Virginia. (JA155 ¶¶ 52-55.) Specifically, the count alleges: "Defendants were negligent in failing to guard against third-party misconduct, i.e. the conduct of the so-called 'pill mill' physicians and staff as wells [sic] as corrupt pharmacists and staff and, in fact by their actions the [d]efendants participated in such misconduct"; "[d]efendants are negligent in not acquiring and utilizing special knowledge and special skills that

5

relate to the dangerous activity in order to prevent and/or ameliorate such

distinctive and significant dangers"; and "[d]efendants breached their duty to

exercise the degree of care, prudence, watchfulness and vigilance commensurate to

the dangers involved in the transaction of its [sic] business." (JA155-56 ¶¶ 55, 58,

59.)

   Count VII is a claim for medical monitoring. (JA156-57 ¶¶ 61-66.) It

references the "[d]efendants' tortious acts, omissions and conduct as set forth

above" and states "pill mill doctors and pharmacies and other careless

professionals have been assisted in their acts or in their carelessness by the

availability of such large quantities of abused substances." (JA156-57 ¶ 61.)

   Count VIII is an antitrust claim. (JA158-60.) It makes unsupported

allegations that the "[d]efendants have conspired with 'pill mill' physicians and

pharmacies who prescribe and fill these prescriptions for non-legitimate medicine

[sic] purposes in order to restrain and monopolize trade." (JA159 ¶ 71.) It further

alleges that the defendants "unfairly and contrary to law distributed controlled

substances which prohibits distributors who distribute controlled substances for

legitimate medical purposes from competing in the 'pill mill market.'" (*Id.* ¶ 73.)

   In his prayer for relief, the Attorney General seeks temporary and

permanent injunctive relief, damages, costs, attorneys' fees and medical

monitoring. (JA160-61.) The damages sought are "[l]osses sustained as the

6

proximate result of both negligent and conscious violations of the West Virginia

Uniform Controlled Substances Act and regulations"; "[d]amages sustained as the

proximate result of nuisances created by the prescription drug abuse epidemic";

and "[d]amages and losses sustained as the proximate result of the [d]efendants'

negligence in marketing, promoting and distributions of controlled substances in

West Virginia." (JA160.)

## III.    THE POLICIES

Liberty Mutual attached excerpts of twelve policies to its Complaint,

each of which covered an annual period from 2000 to 2012. (JA010-11 ¶ 12,

JA022-135.) In the Complaint, Liberty Mutual failed to identify which policies

govern the conduct alleged in the West Virginia Action, but since J M Smith first

engaged in the distribution of pharmaceuticals in West Virginia in late 2011, the

September 2010-September 2011 and the September 2011-September 2012

policies have the most application here. (*See* JA336 n.3, JA318-19.)[2]

The 2010-11 policy bestows upon Liberty Mutual the "right and duty

to defend the insured against any 'suit' seeking . . . damages." (JA117 ¶ 1(a).)

The "damages" are those "because of 'bodily injury' or 'property damage' to

_____

2.  In the Joint Appendix, the parties only included the CGL policy pages for the
    2010-11 policy. (*See* JA117-32 (2010-11 CGL policy); *cf*. JA022-53 (excerpts
    of the 2000-10 policies containing only premium pages).)

which this insurance applies." (*Id*.) The policy applies to "bodily injury" only if it is "caused by an 'occurrence' . . . during the policy period." (*Id*. ¶ 1(b).)

"Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (JA130 ¶ 13.) "Suit" is defined as "a civil proceeding in which damages because of 'bodily injury' . . . to which this insurance applies are alleged." (JA131 ¶ 18.) "Bodily injury" is defined as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (JA129 ¶ 3.) The 2010-11 policy also states that "[d]amages because of 'bodily injury' include damages claimed by any person or organization . . . at any time from the 'bodily injury.'" (JA118 ¶ 1(e).)

Liberty Mutual calculated the premium rates it charged for all the policies issued to Liberty Mutual, including the 2010-11 policy, based on sales figures provided by J M Smith. (*See* JA053 (excerpt of policy covering September 2009-September 2010 showing calculation of premium based on national sales figures provided by J M Smith), JA057 (excerpt of policy covering September

8

2010-September 2011 showing same).)[3]  The premium was approximately $34,000 for the 2000-01 policy (JA023-24), based on sales figures of $549 million and rose to approximately $245,000 for the 2010-11 policy (JA056-57), when sales were approximately $2.4 billion.

## IV.   THE COUCH AFFIDAVIT

Together with the Defendants' Memorandum in Opposition to the Plaintiff's Motion for Summary Judgment and in Support of Defendants' Cross Motion for Summary Judgment (JA236-63), J M Smith submitted a three-and-a-half-page affidavit of Ken Couch, president of Smith Drug Company ("Couch Affidavit").  (JA264-67.)  The affidavit made four basic factual assertions:  (1) Liberty Mutual used sales data provided by J M Smith to calculate premiums and was aware that J M Smith's business was the distribution of pharmaceuticals, which included controlled substances (JA265 ¶¶ 4, 5); (2) J M Smith distributed pharmaceuticals in response to orders placed by licensed pharmacies (JA266 ¶¶ 7-8, 11); (3) J M Smith began distributing pharmaceuticals in West Virginia in late 2011 and had three customers (*id.* ¶ 10); and (4) J M Smith had procedures in place to monitor orders and identify excessive shipments (*id.*).

---

3.  JA053 shows that the premium was calculated by charging 0.1070 per $1000 of sales for the 2009-10 policy.  The same method was used the following year, except the charge was 0.1020 per $1000 of sales.  (JA057.)

## V.    THE JUDGMENT BELOW

On September 24, 2013, the District Court issued an Opinion and Order deciding Liberty Mutual's motion for summary judgment and J M Smith's cross-motion for summary judgment ("Opinion").  (JA331-41.)  Liberty Mutual had sought summary judgment on the "threshold issue" of "[d]oes the West Virginia Complaint allege a covered occurrence?"  (JA201.)  J M Smith cross moved for summary judgment that Liberty Mutual had a duty to defend it in the West Virginia Action.  (*See* JA241-43.)

The District Court's Opinion denied Liberty Mutual's motion for summary judgment and granted J M Smith's cross-motion.  (JA331.)  After considering each of the West Virginia Complaint's eight counts, the District Court found that the West Virginia Complaint alleged an "occurrence" within the meaning of the policies and that Liberty Mutual therefore had a duty to defend.  (JA340.)  The District Court stated that it disagreed with Liberty Mutual's argument that the West Virginia Complaint "alleges facts which support only knowing misconduct," and instead found that the West Virginia Complaint "contains specific allegations of negligence."  (JA338.)

The District Court went on to consider Liberty Mutual's argument that the West Virginia Complaint did not allege an "occurrence because [the] harm caused by [J M Smith's] intentional acts [were] not accidental if [they were] a

10

natural and probable consequence of those acts." (JA338-39.)  After reviewing the

authorities cited by Liberty Mutual, the District Court found those cases

distinguishable on the basis that, although "the acts alleged in the Underlying

Complaint are arguably based upon intentional acts which resulted in violations of

West Virginia law[,] . . . the conduct of distributing prescription drugs based upon

orders placed by pharmacies is not, in and of itself, illegal and the violation of laws

cannot be reasonably anticipated." (JA340.)

The District Court therefore denied Liberty Mutual's summary

judgment motion and granted J M Smith's cross-motion on the duty to defend.  It

further denied summary judgment on the duty to indemnify, since such duty would

be determined by the fact finder in the underlying action.  (*Id.*)

On November 12, 2013, the District Court entered an order granting

Liberty Mutual's motion to certify the Opinion as final and permitting an

immediate appeal pursuant to Federal Rule of Civil Procedure 54(b).  (JA358-60.)

Liberty Mutual filed its Notice of Appeal on December 2, 2013.  (JA361.)

## **<u>SUMMARY OF ARGUMENT</u>**

The only real issue in this Appeal is whether the underlying West

Virginia Complaint seeks damages for any harm that potentially could have been

11

caused by an "occurrence."[4]  After full briefing and oral argument, the District

Court found that the West Virginia Complaint did indeed allege an occurrence and

that Liberty Mutual had a duty to defend.

The District Court is correct:  the West Virginia Complaint does

allege an "occurrence."  Interpreted, as the well-settled standard requires, in the

way that most favors coverage, the West Virginia Complaint seeks damages based

on the defendant drug distributors' alleged negligence in distributing their products

to licensed pharmacies in West Virginia.  The alleged result of this conduct was

widespread, "epidemic" abuse of prescription pharmaceuticals and related injuries.

As alleged, this widespread drug abuse was neither the result of J M Smith's

necessarily intentional conduct, nor the probable consequence of J M Smith's

business of distributing prescription pharmaceuticals to licensed pharmacies; thus,

the West Virginia Complaint alleges a straightforward example of an accident, or

"occurrence."

---

4. Liberty Mutual also seeks reversal of the District Court's decision denying it
summary judgment on the issue of whether it has the duty to indemnify J M
Smith in the West Virginia Action.  However, the Court's ruling on that issue
will be entirely dependent on how it rules on the existence of an occurrence.  If
the Court finds a duty to defend, the duty to indemnify will be determined by
the finding of facts in the West Virginia Action, and thus summary judgment is
premature.  If the Court finds no duty to defend, there will be no duty to
indemnify.  (*See infra* pp. 52-53.)

Yet, Liberty Mutual, viewing the West Virginia Complaint, not, as required, in the light most favorable to finding coverage, but instead in the light most favorable to Liberty Mutual, argues for the conclusion that the *only* bases for the claims in the complaint are intentional acts, and therefore that the complaint cannot allege an "occurrence." Liberty Mutual also argues that there is no "occurrence" because the harms alleged in the West Virginia Complaint were the "natural and probable" outcome of J M Smith's actions. Both of these arguments are without merit, since both are based on improperly reading the underlying complaint in the light most favorable to the insurer. They are a misreading of the authorities Liberty Mutual cites and, moreover, they ignore the allegations of actual negligent conduct in the West Virginia Complaint.

As an additional argument, Liberty Mutual contends that the District Court's Opinion should be reversed because it improperly relied on the Couch Affidavit. However, the Couch Affidavit does not provide a basis for reversal. The facts contained in the Couch Affidavit were not improper extrinsic evidence, since they were discernible from the underlying complaint and/or were known to Liberty Mutual. Furthermore, even if the facts contained in the Couch Affidavit were not properly before the District Court, the District Court's reference to them is not a basis for reversible error, since its Opinion was not dependent upon the affidavit.

13

Finally, Liberty Mutual seeks for the first time on appeal to introduce an entirely new basis for deciding the duty to defend issue: lack of bodily injury. Liberty Mutual, having chosen to put all its eggs in the occurrence basket, did not argue bodily injury below. In fact, Liberty Mutual explicitly denied the District Court's invitation to discuss the issue at the hearing on the motions underlying this Appeal, where it admitted that the issue "has not been fully briefed" and stated that it would somehow be "held in reserve." (JA327:14-15.) Liberty Mutual cannot now decide to pull this argument out of "reserve" for purposes of this Appeal.

## **ARGUMENT**

## I.     **STANDARD OF REVIEW**

This Court reviews a district court's grant of summary judgment *de novo*. *See Whiteman v. Chesapeake Appalachia, L.L.C.*, 729 F.3d 381, 385 (4th Cir. 2013); *Fuisz v. Selective Ins. Co. of Am.*, 61 F.3d 238, 241 (4th Cir. 1995). Summary judgment is appropriate if, "from the totality of the evidence . . . the court believes no genuine issue of material fact exists for trial and the moving party is entitled to judgment as a matter of law." *See Whiteman*, 729 F.3d at 385. All doubts and inferences are resolved in favor of the non-moving party. *See id.*; *Red Roof Inns, Inc. v. Scottsdale Ins. Co.*, 419 F. App'x 325, 329 (4th Cir. 2011).

Under South Carolina law, an insurer's duty to defend is generally determined by the allegations of the underlying complaint. *Jessco Inc. v. Builders*

14

*Mut. Ins. Co.*, 472 F. App'x 225, 228 (4th Cir. 2012) (per curiam) (citing *City of Hartsville v. S.C. Mun. Ins. & Risk Fin. Fund*, 677 S.E.2d 574, 578 (S.C. 2009)). However, the duty to defend may also be determined by facts outside of the complaint that are known by the insurer. *Jessco*, 472 F. App'x at 228 (citing *USAA Prop. & Cas. Ins. Co. v. Clegg*, 661 S.E.2d 791, 798 (S.C. 2008)); *Hartsville*, 677 S.E.2d at 578.

## II.   THE WEST VIRGINIA COMPLAINT ALLEGES AN OCCURRENCE, AND LIBERTY MUTUAL THEREFORE HAS A DUTY TO DEFEND.

The rules of interpretation for insurance contracts are generally the same as those that apply to the interpretation of contracts. *E.g.*, *Linton v. AXA Equitable Life Ins. Co.*, 533 F. App'x 179, 180 (4th Cir. 2013) (per curiam) ("Under South Carolina law, '[a]n insurance contract is subject to the general rules of contract construction.'"). However, the policy must be read in the light most favorable to the insured. If the underlying complaint creates a possibility of coverage, the insurer has a duty to defend. *Jessco*, 472 F. App'x at 228 (quoting *Hartsville*, 677 S.E.2d at 578). "[W]hen an insurance policy . . . is susceptible to more than one reasonable interpretation, one of which would provide coverage, [courts] must hold as a matter of law in favor of coverage." *Linton*, 533 F. App'x at 181 (quoting *Gaskins v. Blue Cross-Blue Shield of S.C*, 245 S.E.2d 598, 602 (S.C. 1978) (alterations in original)).

15

Under the policies, Liberty Mutual has a duty to defend J M Smith in any "'suit' seeking . . . damages for 'bodily injury' . . . caused by an 'occurrence." (JA117 ¶ 1(a)-(b)(1).)  "Occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (JA130 ¶ 13.)  The term "accident" is not defined in the policy.

In the absence of a contractual definition, South Carolina law has interpreted an "accident" as "[a]n unexpected happening or event, which occurs by chance and usually suddenly, with harmful result, not intended or designed by the person suffering the harm or hurt."  *Auto-Owners Ins. Co. v. Rhodes*, 748 S.E.2d 781, 789-90 (S.C. 2013) (citation omitted) (alteration in original).  Stated slightly differently, "[t]he South Carolina Supreme Court has interpreted the term 'accident' to mean 'an effect which the actor did not intend to produce and cannot be charged with the design of producing'. . . .  'The intent to act, coupled with the intent to produce the consequences in not an 'accident' . . . ."  *State Farm Fire & Cas. Ins. Co. v. Reed*, No. 7:07-2958-HFF 2009 WL 735133, *4 (D.S.C. Mar. 19, 2009) (quoting *Mfrs. & Merchs. Mut. Ins. Co. v. Harvey*, 498 S.E.2d 222, 225, 227 (S.C. Ct. App. 1998) (citing *Goethe v. New York Life Ins. Co.*, 190 S.E. 451 (S.C. 1937))).

Here, the West Virginia Complaint alleges an "occurrence" under the policies.  First, it contains allegations that encompass classic negligent conduct:

16

the failure to act with sufficient care, which proximately caused the damages alleged, thus triggering the duty to defend. Second, the complaint is not, despite Liberty Mutual's arguments, based solely on intentional actions. Third, the alleged harms of an "epidemic" of drug addiction were not the natural or probable result of J M Smith's distribution of pharmaceuticals.

### A.     The Inclusion of Any Covered Claim Triggers the Duty to Defend the Entire Complaint.

South Carolina law "requires that a triggered insurer with a duty to defend the policyholder in a suit must defend the policyholder against all claims in that suit, even those claims that are not covered under the policy." *Cincinnati Ins. Co. v. Crossman Communities of N.C.*, No. 4:09-CV-1379-RBH, 2013 WL 1282017, *11 (D.S.C. March 27, 2013); *Ellett Bros., Inc. v. U.S. Fid. & Guar. Co.*, 275 F.3d 384, 388 (4th Cir. 2001). This means that "an insurer's duty to defend is triggered if *any* cause of action in a complaint seeks damages covered by the policy." *Liberty Mut. Fire Ins. Co. v. J.T. Walker Indus., Inc.*, No. 2:08-2043-MBS, 2012 WL 3292973, at *16 (D.S.C. Aug. 10, 2012) (emphasis in original), *aff'd in part and vacated in part*, Nos. 12-2256, 12-2350, 2014 WL 504086 (4th Cir. Feb. 10, 2014); *accord Berenyi, Inc. v. Landmark Am. Ins. Co.*, C.A. No. 2:09-CV-01556-PMD, 2010 WL 233861, at *4 (D.S.C. Jan. 14, 2010) ("The inclusion of claims which would not be covered by the policy does not abrogate an insurer's duty to defend when the complaint raises at least one claim covered by the

17

policy."); *Town of Duncan v. State Budget and Control Bd., Div. of Ins. Servs.*, 482 S.E.2d 768, 773-74 (S.C. 1997) (where a cause of action is covered by policy, an insurer is not entitled to deny coverage because complaint contains other causes of action that are not covered); *see also Gen. Agents Ins. Co. of Am. v. Midwest Sporting Goods Co.*, 765 N.E.2d 1152, 1156 (Ill. App. 2002) ("Moreover, if the underlying complaints allege several theories of recovery against the insured, the duty to defend arises even if only one such theory is within the potential coverage of the policy." (quoting *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 930 (Ill. 1991)).

Moreover, a complaint must be interpreted liberally, so that if it contains even a potentially covered cause of action, coverage exists.  As with the interpretation of the policy, the underlying complaint is to be read broadly in favor of the insured.  Where a complaint contains any allegations that could potentially be covered by the policy, the court must find in favor of the insured.  *E.g.*, *Cincinnati Ins.*, 2013 WL 1282017, at *10 (finding duty to defend where, based on the allegations in the complaint, there was "at least the potential for coverage"); *Berenyi*, 2010 WL 233861, at *4 ("'If the underlying complaint creates a possibility of coverage under an insurance policy, the insurer is obligated to defend.'" (quoting *Isle of Palms Pest Control Co. v. Monticello Ins. Co.*,  459 S.E.2d 318, 319 (S.C. Ct. App. 1994)); *Union Ins. Co. v. Soleil Grp. Inc.*, 465 F.

18

Supp. 2d 567, 573 (D.S.C. 2006) ("[T]he complaint is construed liberally, with all doubts resolved in favor of insured."); *Hartsville*, 677 S.E.2d at 543; *see also Fuisz*, 61 F.3d at 241 ("At [summary judgment] we need simply inquire whether the complaint states a cause of action that could potentially result in liability based on a less culpable state of mind . . . ."). The duty to defend determination is dependent upon the specific allegations of the complaint, not the identified causes of actions. *Hartsville*, 677 S.E.2d at 545 (noting that, although the underlying complaint did not specifically plead civil conspiracy, the allegations in the complaint detailed a theory sounding in conspiracy and therefore the insurer had a duty to defend); *see also Sentry Select Ins. Co. v. Guess Farm Equip. Inc.*, No. 5:12-03504-JMC, 2013 WL 5797742, at *4 (D.S.C. Oct. 25, 2013) ("[A]n analysis of [the duty to defend] involves the allegations of the complaint and not the specifically identified causes of action.").

Here, the West Virginia Complaint contains at least one count that invokes purely negligent acts: Count VI, aptly entitled "Negligence." (JA155-56.) This count describes a classic negligence claim:

- "Defendants have a duty to exercise reasonable care." (JA155 ¶ 52);

- "Defendants were negligent in failing to guard against third-party misconduct." (*Id.* ¶ 55);

- "Defendants are negligent in not acquiring and utilizing special knowledge and special skills." (JA156 ¶ 58);

19

- "Defendant distributors are required to exercise a high degree of care and diligence . . . .  Defendants breached their duty to exercise the [commensurate] degree of care."  (*Id.* ¶ 59); and

- "[I]njuries to Plaintiff would not have happened in the ordinary course of events had the [d]efendants used due care."  (*Id.* ¶ 60.)

Without considering any other count in the West Virginia Complaint, this count alone creates a duty to defend in the West Virginia Action.

However, a review of the other counts in the West Virginia Complaint reveals that these claims too are either negligence claims or claims that are pled on alternative theories of both negligent and intentional conduct, but which fail to assert any supporting factual allegations about intent.

Count I is based on WVUCSA regulations requiring operation of "a system to disclose . . . suspicious orders of controlled substances."  (JA147 ¶ 15 (quoting W. Va. Code R. § 15-2-4.4 (2001)).)  Although stating that defendants "willfully and repeatedly violated" the act and regulations, the described conduct is negligent conduct:

> 16.  The [d]efendants have ***failed to diligently respond*** to suspicious orders which the [d]efendants have filled.  The [d]efendants therefore have ***failed to provide effective controls and procedures*** to guard against diversion of controlled substances in contravention of West Virginia law.

> 17.  ***By failing to do so***, [d]efendants have willfully and repeatedly violated the [WVUCSA] and corresponding relegations.

20

(JA147 (emphasis added).)  That the Attorney General is not resting solely on a claim of intentional conduct is further made clear by the prayer for relief, which seeks "[l]osses sustained as the proximate result of ***both negligent*** and conscious violations of the [WVUCSA] and regulations."  (JA160 ¶ 2(a) (emphasis added).)

Count II is also a negligence claim, or, if read generously, pleads alternative theories, as stated in its title:  "Damages resulting from ***Negligence and*** Violations of the West Virginia Uniform Controlled Substances Act."  (JA148 (emphasis added).)  The negligence aspect of the count is plain:  it states that by "regularly distributing large quantities of controlled substances to customers . . . [t]he [d]efendants ***negligently*** acted with others to violate West Virginia's drug laws," and that defendants had "by their acts and omissions ***proximately caused*** and substantially contributed to damages . . . by creating conditions which contribute to the violations of West Virginia law by others, by their negligence by their and reckless disregard of the customs, standards and practices within [d]efendants' own industry.  (JA149 ¶¶ 26, 28 (emphasis added).)  The only part of the count that suggests intentional conduct is the statement that the West Virginia "[d]efendants have willfully turned a blind eye towards the actual facts" (JA149 ¶ 26), which is not an assertion that defendants intentionally violated any law or regulation or that the so-called conduct in question — "turning a blind eye" — led to any of the damages alleged in the Complaint.

21

Count III alleges unfair methods of competition or unfair or deceptive acts or practices under the West Virginia Consumer Credit and Protection Act. (*See* JA150-51 ¶¶ 34-36.)  Although the count alleges that the violations were "willful," it states that the unfair or deceptive act at issue is the violation of the same controlled substance regulations cited in Count I, violations that, as discussed above, are based on negligent conduct.  (*Id.* ¶¶ 34, 36.)  It makes no factual allegations related to acts of conspiracy or advertising.

Count IV, "Creating a Public Nuisance," also does not rest on intentional conduct, and pleads in the alternative that "[d]efendants knew *or should have known*" about the problem of controlled substance abuse in West Virginia and that based on the "quantities" and "frequency" knew or should have known that these substances were not being prescribed and consumed for legitimate medical purposes" and alleges that defendants acted "negligently, recklessly *and/or* intentionally."  (JA152 ¶¶ 42-43 (emphases added).)

Count V is an unjust enrichment claim and contains no reference to any intentional conduct, but states that "[d]efendants have thus been enriched unjustly by **neglecting** its [sic] duty of distributing drugs only for proper medical purposes."  (JA154 ¶ 49 (emphasis added).)

Count VII is a claim for medical monitoring.  (JA156-58.)  It also does not make any statements about intentional conduct and refers only to the

22

defendants' "tortious acts, omissions and conduct as set forth above." (JA156 ¶ 61.)

Count VIII is an antitrust claim (JA158-60), and while it makes the bare allegation that defendants "conspired with 'pill mill' physicians and pharmacies," it makes no specific factual allegations regarding intent. (JA159 ¶ 71.)

Thus, the brunt of any alleged intentional conduct in the West Virginia Complaint arises from a failure to have "effective" controls for monitoring suspicious orders, but, as discussed under Count I, the conduct that resulted in this potential violation of the regulations was negligent in character. (*See* JA147 ¶¶ 16-17.) The gravamen of the West Virginia Complaint is negligence — that J M Smith did not conduct its business with the proper degree of care (*e.g.*, JA155-56 ¶¶ 51-60) — with some alternative pleadings making general statements of willful conduct. Moreover, the Court is not required to find that the entire complaint sounds in negligence in order to find coverage; if even one theory of liability in the complaint is based on unintentional, negligent conduct, a duty to defend exists. *See e.g.*, *Cincinnati Ins.*, 2013 WL 1282017, at *11; *Liberty Mut. Fire Ins.*, 2012 WL 3292973, at *16; *Duncan*, 482 S.E.2d at 773-74; *Midwest Sporting Goods*, 765 N.E.2d at 1156.

23

**B.** **The Inclusion of Language of Intent in the West Virginia Complaint Does Not Warrant Effectively Redrafting it to Assert Claims Solely For Intentional Conduct.**

Liberty Mutual argues that the Court must ignore all the allegations based on negligent conduct in the West Virginia Complaint and must instead look beyond the language in the complaint, "specifically . . . to the allegations incorporated into each cause of action." (Appellant's Br. at 11.) This argument is based on the South Carolina Supreme Court's statement that courts should "look beyond the labels describing the acts to the act themselves which form the basis of the claim against the insurer" when determining coverage. (*See id.* (citing *Collins Holding Corp. v. Wausau Underwriters Ins. Co.*, 666 S.E.2d 897, 899 (S.C. 2008)).) J M Smith does not dispute the applicability of *Collins*, but contends that the application urged by Liberty Mutual is backwards. As discussed above, looking "beyond the labels describing the acts" to what is actually alleged in the West Virginia Complaint will reveal that the essence of the West Virginia Complaint is negligent, not intentional, conduct.

To find no coverage in a complaint that on its face states causes of action for negligence is something courts have done only in extreme cases where the facts as pled show that the potential damages arise *only* from intentional acts. As *Collins* states, and the other cases cited by Liberty Mutual illustrate, the complaint must rest ***solely on factual allegations of intentional acts*** to justify a

24

finding that no negligence is being actually pled.  *See, e.g., id.* (citing to "the *facts of the complaint*" as the basis for finding intentional conduct (emphasis added)); *Adolph Coors Co. v. Truck Ins. Exch.*, 960 A.2d 617, 621 (D.C. Cir. 2008) ("*factual allegations* described in the complaint are more significant than are the particular causes of action asserted" (emphasis added).).

Here, although containing "labels describing the acts" as intentional, *see Collins*, 666 S.E.2d at 899, the West Virginia Complaint contains *no facts* about J M Smith's alleged intentional acts.  (*See generally* JA139-61.)[5]  The only indication of willful or intentional conduct consist of solitary invocations of descriptions such as "willfully" or "intentionally," without any supporting facts. Putting aside for the moment that these counts also raise theories of negligence (*see supra* Section II.A), the only language in the complaint's counts suggesting the intentional nature of J M Smith's alleged acts consists of the following:

- The West Virginia defendants "have willfully and repeatedly" violated the WVUCSA.  (JA147 ¶¶ 16, 17 (Count I).)

---

5. The only specific factual allegations in the complaint relate to the effect of drug addiction in the state (JA141-43 ¶ 6(a)-(e), (h)); facts regarding one pharmacy, without any allegations that any defendant distributed pharmaceuticals to that pharmacy (JA142 ¶ 6(f)); and the statements of one pharmacist who pled guilty to violation of drug laws, but without any allegations tying any defendant to the pharmacist's activity (*id.* ¶ 6(g)).

- Defendants have "wilfully turned a blind eye toward the facts." (JA149 ¶ 26 (Count II).)

- Defendants' "repeated" violations of the law were "willful." (JA151 ¶ 36 (Count III).)

- "Defendants negligently, recklessly and/or intentionally, and acting with blind indifference to the facts created . . . a public nuisance." (JA152-53 ¶ 43 (Count IV).)[6]

These bare statements, presented without factual elaboration on underlying acts, do not warrant a finding that the entirety of the West Virginia Complaint must be read as based in intentional conduct.

In *Collins*, the Supreme Court of South Carolina found sufficient basis to look "beyond the labels describing the acts to the acts themselves" in the underlying complaint when it considered the alleged *specific facts* of illegal conduct contained in the complaint.  666 S.E.2d at 899.  *Collins* involved an insured who owned, operated, and distributed gambling machines, and who sought

---

6. In addition, the "Summary of the Action" states: "'Pill Mills' consist of medical providers, pharmacist and distributors of controlled substances, each of whom must knowingly or while acting grossly negligent, prescribe, dispense or distribute prescription medicine for illegitimate medical purposes. . . .  [T]hese [d]efendants have acted negligently, recklessly and all times illegally."  (JA141 ¶¶ 4, 5.)

insurance coverage when it was sued for harms allegedly caused by the machines. *Id.* at 898. The complaint set out facts that alleged actual acts in deliberate violation of gambling laws: "The facts of the complaint asserted that Collins systematically violated South Carolina laws specifically enacted to protect the public from excessive gambling losses. For example, the Plaintiffs asserted Collins exceeded the maximum daily payout limit of $125 and engaged in advertising schemes which fraudulently induced the Plaintiffs to believe that they could win jackpots in excess of the $125 limit." *Id.* at 899. In light of these specifically pled intentional acts, the *Collins* court reviewed the cause of action for negligent misrepresentation — the only negligence claim in the underlying complaint. *Id.* at 900. The court found that the claim was solely based on the allegations regarding the intentional actions of the insured and therefore found that the count was not in fact a claim for negligent conduct. *Id.* Here, the West Virginia Complaint does not make allegations based *solely* on specific acts of intentional conduct. To the contrary, the West Virginia Complaint contains no facts supporting intentional acts.

The other cases cited by Liberty Mutual similarly show that the negligence claims asserted in an underlying complaint may only be disregarded when a complaint is clearly based purely on intentional actions. *Midwest Sporting Goods* (*see* Appellant's Br. at 16), arose from a gun seller seeking coverage for a

27

suit alleging the provision of guns to inappropriate persons.  Unlike here, and like

*Collins*, the underlying complaint in *Midwest Sporting Goods* contained specific

facts that showed that the basis of the underlying complaint rested solely on the

insured engaging in intentional and illegal acts in its direct sales of firearms to

improper persons.  The underlying complaint described "several specific sales" by

Midwest clerks to undercover officers as examples that could be used to infer the

insured's general procedures.  765 N.E.2d at 1154-55, 1157.  In those sales,

undercover officers reported that sales clerks had advised them on how to "evad[e]

police detection when bringing guns into the city, and methods for avoiding the

reporting requirements of the [U.S. Bureau of Alcohol, Tobacco and Firearms

("ATF")]."[7] *Id*. at 1158.  The complaint further alleged that the insured was

provided information by the ATF informing it that multiple sales of firearms to

Chicago residents created a substantially greater risk of criminal possession and

use, as well as information about deaths caused by such sales.  *Id.* at 1155, 1158.

Based on these pled acts, the court held that the insurance company had no duty to

---

7.  In *Midwest Sporting Goods*, clerks instructed  undercover officers on multiple
    occasions on ways to circumvent local and federal gun laws and arranged for
    the officers to pick up firearms at another store outside the reach of Cook
    County's gun regulations, although the purchasers had made them aware of
    being in-county residents.  On another occasion, the clerk permitted a "straw"
    purchase, by allowing one person, who did not provide any identification, to
    make a purchase using another person's information.  *Id.* at 1154-55.

28

defend, since the insured had deliberately and illegally acted to place guns in the hands of people who were known to cause harm to others, and therefore its conduct was not an accident. *Id.* at 1160.

Similarly, in *State Farm Fire and Casualty Co. v. Tran* (*see* Appellant's Br. at 20-21), the complaint contained specific facts showing that the insured had engaged in deliberate and illegal activity. No. 1:10CV469-LG-RHW, slip op. at 9-10 (S.D. Miss. Aug. 20, 2012) (attached to Appellant's Brief). Tran was a pharmacist who was convicted of multiple counts of dispensing a controlled substances outside the scope of professional practice, conspiracy to distribute or dispense a controlled substance outside the scope of professional practice to a person under twenty-one, and of maintaining a place for the purpose of dispensing controlled substances outside the scope of professional practice. *Id.* at 1-2. Tran was sued by multiple plaintiffs for wrongful death and damages related to Tran's illegal dispensing of controlled substances. *Id.* at 3. Unsurprisingly, the court found that claims in the complaint described intentional conduct.[8] *Id.* at 9-10.

_____

8. Liberty Mutual states that the allegations here are "even further from a covered occurrence than the discrete allegations in *Tran*." (Appellant's Br. at 21.) Liberty Mutual conveniently overlooks both the fact that Tran had been convicted of crimes similar to the allegations in the underlying complaints, and that Tran was the pharmacist and the owner of the pharmacy — which in the

(Footnote continued on next page)

Liberty Mutual also relies on *Adolph Coors Co*. (*see* Appellant's Br. at 15), where a manufacturer of alcohol sought coverage for a suit alleging that it had marketed alcohol to children. 960 A.2d at 619. In finding no coverage, the court considered the fact that the underlying complaint did not seek redress for any incidental exposure of children to advertising directed at adults, but only for advertising that involved the "deliberate and reckless targeting of underage consumers." *Id*. at 624. Therefore, since the activity at issue was defined solely as activity that by definition deliberately violated of the law, the court found no coverage.[9] *Id.* at 625.

Thus, Liberty Mutual's authorities all involve instances where the underlying complaint alleged facts showing that the insured had engaged in specified intentional illegal acts that were the sole basis of the underlying complaint, or that the acts at issue in the complaint, by their very nature, were intentional.

---

(Footnote continued from prior page)

terms of the West Virginia Complaint was a "pill mill" — directly dispensing controlled substances to customers in excessive quantities.

9. *See also MCE Auto., Inc. v. Nat'l Cas. Co.*, No. 6:11-1245-TMC, 2012 WL 4479163, at *4 (D.S.C. Sept. 28, 2012) (complaint alleged facts that insured sold thirteen cars to 82-year-old woman in less than two years), *aff'd*, 535 F. App'x 303 (4th Cir. 2013) (per curiam); *Harvey*, 498 S.E.2d 226-27 ("occurrence" at issue was alleged sexual abuse of minors by the insured).

In contrast, the West Virginia Complaint contains only "labels" of intentional conduct. It does not identify any specific acts of intentional conduct, much less provide a basis to suggest that J M Smith's alleged conduct was solely intentional conduct.

### C.    Widespread Addiction is Not the Natural Consequence of J M Smith's Alleged Conduct.

Liberty Mutual contends that, "even if [the West Virginia Complaint] described mere negligent conduct," it still does not allege an accident or occurrence because the damages were the natural and probable consequence of those acts. (Appellant's Br. at 17.) Despite the stated rhetorical concession that it is arguing this issue based on negligence, Liberty Mutual nevertheless frames the issue on a selective reading of the West Virginia Complaint. It sums it up as "the costs and harms of drug abuse are normal, expected consequences of persistent violations of West Virginia's controlled substance laws." (*Id*. at 19.) This description, however, improperly frames the issue.

As the definition of "accident" adopted in South Carolina illustrates, an accident is an "effect which the actor did not intend to produce." *See Reed*, 2009 WL 735133 at *4. As discussed in the 1950 case, *C.Y. Thomason v. Lumbermens Mutual Casualty Co.* — one of the four cases that Liberty Mutual relies upon — no accident will be found when intentional actions are coupled with

the intent to produce the result at issue.  183 F.2d 729, at 732-33 (4th Cir. 1950);
*see also Harvey*, 498 S.E.2d at 227.

Reading the West Virginia Complaint in favor of finding any potential covered causes of action, as required,[10] the damages alleged are neither the result of J M Smith's intentional acts nor the intended result of J M Smith's actions.  On the first point, J M Smith's alleged actions in the West Virginia Complaint are that it acted negligently in distributing pharmaceuticals.  On the second, widespread drug addiction was not the intended result of J M Smith's distribution of prescription pharmaceuticals.[11]  No factual allegations in the West Virginia Complaint support

_____

10. As discussed above, the complaint must be read liberally in favor of coverage. (*See supra* Section II.A.)

11. The reasonable expectation of J M Smith was not that its legal distribution of pharmaceuticals would result in widespread addiction, but that its pharmacist customers (and their customers and those customers' physicians) would be governed by and acting in accordance with an extensive set of laws and regulations, and that those laws and regulations were being enforced by the State of West Virginia.  The state has a comprehensive regulatory scheme in place to govern prescription drugs and controlled substances.  For example, the West Virginia Code Chapter 30, which includes provisions such as:  § 30-5-2(a) (stating "[i]t is unlawful for any person in this state to practice or offer to practice pharmacist care without a license pursuant to the provisions of this article"); § 30-5-9 (detailing the pharmacists qualifications for licensure); § 30-5-10 (detailing the practice scope for licensed pharmacists); § 30-5-14 (containing rules prohibiting the dispensing of prescription orders in absence of practitioner-patient relationship) and the West Virginia Code Chapter 60A (Uniform Controlled Substances Act), which includes provisions such as § 60A-3-302(a) (stating "[e]very person who manufactures, distributes, or

(Footnote continued on next page)

that J M Smith intended, or could have reasonably anticipated, that its distribution of prescription pharmaceuticals in response to orders from licensed pharmacists would result in the addiction and medical injuries alleged in the complaint.[12]

The cases Liberty Mutual relies upon are distinguishable.  (*See* Appellant's Br. at 17-18.)  In each of these cases, the insured either intentionally created the condition that was an obvious harm or continued the harmful course of conduct after it had actual knowledge of the harm.

---

(Footnote continued from prior page)

dispenses any controlled substance within this state . . . must obtain annually a registration"); § 60A-3-303(a)(1)-(7) (detailing that "[t]he state board of pharmacy shall register an applicant to manufacture or distribute controlled substances included in Schedules I, II, III, IV and V unless it determines that the issuance of that registration would be inconsistent with the public interest and that, in determining the public interest, the state board of pharmacy consider various factors, including "[m]aintenance of effective controls against diversion of controlled substances into other than legitimate medical, scientific, or industrial channels").

12. Citing to *Baker v. American Insurance Co. of Newark, N.J.*, 324 F.2d 748, 751 (4th Cir. 1963) (*see* Appellant's Br. at 18), Liberty Mutual states that the relevant standard here is "objective."  However, the citation to *Baker* does support this description.  In fact, courts applying South Carolina law have found the opposite:  it is an actor's subjective view that is at issue.  *E.g.*, *Dunes W. Residential Gold Props., Inc. v. Essex Ins. Co.*, Nos. 06-2020, 06-2041, 2007 WL 4622916, at *2 (4th Cir. Dec. 28, 2007) (per curiam) ("[W]hether an accident had occurred 'is not to be determined in terms of whether [an event] was reasonably foreseeable, but in terms of  . . . whether it was an event which [the insured] actually expected or anticipated." (alterations in original)).  Regardless, the "epidemic" of drug addiction alleged in the West Virginia Complaint was neither the probable consequence of J M Smith's distribution business in West Virginia, and nor was it expected or anticipated by J M Smith.

33

- In *C.Y. Thomason*, the insured was a contractor who had directly created the continuing condition, which had resulted in multiple instances of flooding of a nearby place of business. 183 F.2d 731. The contractor also created a bump in the road that repeatedly damaged cars entering that business. *Id.*

- *Ducker v. Central Surety & Insurance Corp.*, 107 S.E.2d 342 (S.C. 1959), is inapplicable, as it does not consider a motion for summary judgment, but whether or not the trial court had properly granted the insurer's motion for nonsuit at the close of the insured's evidence. The court found that the trial court had erred by failing to submit to the jury the issue of whether or not there was an accident within the coverage of the insurance policy. *Id.* at 343.[13]

- *AES Corp. v. Steadfast Insurance Co.*, which was decided under Virginia law, held that a company's release of carbon dioxide

---

13. The insured in *Ducker* sold and installed a furnace that caused repeated damages to a home. 107 S.E.2d at 342-43. The insured claimed that he had been selling and installing the same make of furnace for fourteen years without similar issues. The court held that the evidence "tended to show several incidents that may reasonably be found to have been accidents within the terms of the policy" and that therefore it was an error not to submit the issue of whether there was an accident to the jury. *Id.* at 343.

34

and other harmful greenhouse gases was not accidental and therefore not covered by the policy at issue.  725 S.E.2d 535, 538 (Va. 2012).

- *State Farm Fire and Casualty Insurance Co. v. Reed*, did not involve a negligence claim, but the intentional firing of a gun at the injured individual.  2009 WL 735133, at *1.

Liberty Mutual also argues that, because the West Virginia Complaint contains allegations that there was "widespread publicity" of the issue (*see* JA152 ¶ 41), J M Smith was on notice of the abuse of prescription pharmaceuticals in West Virginia, and that therefore the "epidemic" alleged in the West Virginia Complaint would be the expected consequence of its actions.  (Appellant's Br. at 18-19.)  In support of this proposition, Liberty Mutual cites *Tran*, which, as discussed above (*see supra* Section II.B.), involved a pharmacist who had been convicted of violations of laws governing controlled substances, and whose conduct the court found to be purely intentional.  *Tran* at 1-3.  Applying Mississippi law, the court in *Tran* held that the underlying complaints rested on "intentional conduct that caused foreseeable injures."  *Id.* at 10.  *Tran* is therefore not on point, since here there are no actual intentional acts pled and no basis to find that the West Virginia Complaint is based purely on intentional conduct.  In other cases cited by Liberty Mutual, but not relied on for this argument, courts have

35

found indications that the insured was "on notice" only when actual facts were pled

showing that the insured had actual knowledge of the issue. *E.g.*, *Midwest*

*Sporting Goods*, 765 N.E.2d at 1155 (ATF provided data to the insured).[14]

### D. Extrinsic Evidence Was Not Improperly Considered by the District Court.

Liberty Mutual complains that the District Court improperly took into

account evidence outside the West Virginia Complaint and argues that this is

reversible error. (Appellant's Br. at 21-23.) This objection arises from

J M Smith's submission of the Affidavit of Ken Couch in Opposition to Plaintiff's

Motion for Summary Judgment and in Support of Defendants' Cross Motion for

Summary Judgment. (JA264-67.) However, the Couch Affidavit does not provide

a basis to reverse the Opinion for two reasons: (1) Liberty Mutual was aware of

the facts contained in the Couch Affidavit; and (2) the District Court did not rely

_____

14. *Midwest Sporting Goods* discusses an Eighth Circuit case, *City of Carter Lake v. Aetna Casulty & Surety Co.*, 604 F.2d 1052 (8th Cir. 1979), which is illustrative of what type of fact scenarios can remove an incident from the realm of accident because of the knowledge of the insured. 765 N.E.2d at 1156-59. In *Carter Lake*, sewage backed up into the home of plaintiffs in the underlying lawsuit. 604 F.2d at 1055. They informed the city, which found the source of the problem, but chose not correct it. Subsequently, sewage backed up into the same home five more times. *Id.* at 1059. Finding that the city "took [a] calculated risk" that further incidents would not occur, and that "[o]nce the city was alerted to the problem, its cause, and the likelihood of reoccurrence, it could not ignore the problem and then look to Aetna to reimburse it for the liability incurred by reason of such inaction," the Eighth Circuit held that the incidences after the first one were not accidents. *Id.*

36

solely on the Couch Affidavit in reaching its decision; thus, its opinion can be upheld independent of the Couch Affidavit.

*First*, the three-and-a-half-page Couch Affidavit stated facts that were known to both J M Smith and Liberty Mutual. Under South Carolina law, the insurer's duty to defend can be determined not only by the allegations of the underlying complaint, but also by facts outside of the complaint that are known by the insurer. *E.g.*, *Jessco*, 472 F. App'x at 228 (citing *USAA Prop.*, 661 S.E.2d at 798); (*see also supra* Section I.)

The Couch Affidavit consisted of four main points:

1.    Liberty Mutual used sales data provided by J M Smith to calculate premiums and Liberty Mutual was aware that J M Smith was in the business of distributing pharmaceuticals, including controlled substances. (JA265 ¶¶ 4, 5.)

2.    J M Smith shipped prescription pharmaceuticals to licensed pharmacies in response to orders placed by those pharmacies. (JA266 ¶¶ 8, 11.)

3.    J M Smith began to ship pharmaceuticals to West Virginia in late 2011, and J M Smith had three customers. (*Id.* ¶ 10.)

4.    J M Smith had procedures in place to monitor orders and identify excessive shipments. (*Id.*)[15]

---

15. To the extent that the Couch Affidavit contains any other assertions or opinions to which Liberty Mutual objects, they are irrelevant as they were not referenced in the Opinion.

Although protesting consideration of the affidavit, Liberty Mutual

tellingly failed to squarely deny that it was aware of these facts. A consideration

of the factual contentions shows that they were either known to Liberty Mutual or

properly ascertainable from the West Virginia Complaint.[16]

On the first point, the policies themselves illustrate that Liberty

Mutual had J M Smith's annual sales data. (*See supra* p. 9 n.3 (discussing pages of

---

16. Liberty Mutual also suggests that the Couch Affidavit was wrongfully submitted to "challeng[e] certain allegations" in the West Virginia Complaint. (*See* Appellant's Br. at 23.) Liberty Mutual cites no legal authority for the idea that extrinsic evidence submitted by the insured cannot be considered if it contradicts the complaint, which is a proposition that appears to have no legal basis and which is contrary to the prohibition against the *insurer* offering evidence contrary to the complaint. *E.g.*, 1 Leo P. Martinez, Marc S. Mayerson & Douglas R. Richmond, New Appleman Insurance Law Practice Guide § 11A.13[2][b] (2014 ed.) ("As a general rule, courts often are reluctant to allow insurers to *preclude* a duty to defend by relying on evidence which flatly contradicts the allegations of the complaint" (emphasis added).). Regardless, nothing in the affidavit contradicts any assertion in the complaint. In particular, Liberty Mutual appears to focus on the idea that the Couch Affidavit contradicts the West Virginia Complaint's allegations that the defendants violated the WVUSCA. (Appellant's Br. at 21, 23.) But the statements in the Couch affidavit — that J M Smith distributed drugs only in response to requests from licensed pharmacies and that J M Smith had procedures in place to monitor excessive shipments — do not contradict any allegation in the complaint. The West Virginia Complaint does not allege that the defendants distributed drugs to unlicensed pharmacies or that the defendants had *no* control system in place, but only that those controls were ineffective. (*See* JA147 ¶ 16 (defendants failed "to provide *effective* controls" (emphasis added)).)

J M Smith's policies illustrating that Liberty Mutual calculated the premiums based on a percentage of sales).)[17]

The second point is readily ascertainable from the fact that shipping pharmaceuticals to licensed pharmacists in response to their orders is the basic business of a "wholesale drug distributor" — the business of J M Smith, according to the West Virginia Complaint (JA144 ¶ 8) — and that the West Virginia Complaint does not allege that J M Smith ever shipped drugs to a non-licensed pharmacy or any other entity.

On the third point, the information about the time during which J M Smith did business in West Virginia, is information necessary in order to determine which of the policies attached to the Complaint are at issue. (*See* JA336 n.3.)[18] Moreover, Liberty Mutual was aware of the states in which J M Smith did business as part of the sales data it received. At most, Liberty Mutual could argue

---

17. Any suggestion that Liberty Mutual did not know that J M Smith was a distributor of pharmaceuticals is fairly ridiculous. Putting aside the name "Smith Drug Company," if nothing else, Liberty Mutual would have had to have had some basic information by which it decided the quite precise percentages it charged J M Smith per sale. (*See supra* p. 9 n.3.)

18. Liberty Mutual appears to have conceded that the 2010-11 policy applies to the West Virginia Action by including the relevant policy provisions for only that policy in the Joint Appendix. (*See supra* p. 7 n.2.)

that it is disputable as to whether it knew that J M Smith had a limited customer base in West Virginia.

The fourth point is also readily ascertainable from the West Virginia Complaint, which alleges that the defendants had "ineffective" controls in place, not that such controls did not exist.  (JA147 ¶ 16.)

Therefore, with the possible exception of the exact number of West Virginia customers, the facts presented in the Couch Affidavit were either discernible from the complaint or known to Liberty Mutual.

*Second*, the District Court, although mentioning facts contained in the Couch Affidavit on several occasions, did not rest its opinion on any facts solely contained therein.  The District Court included facts contained in the Couch Affidavit only in three instances.  The first reference was where the District Court found that "the conduct of distributing prescription drugs based upon orders placed by pharmacies is not, in and of itself, illegal" and added, "especially as to J M Smith, which has been distributing prescription drugs in West Virginia only for a short time and to only three pharmacies."  (JA340.)[19]  This citation to facts that provide further support for the District Court's statement cannot provide the

_____

19. As discussed above, the earlier portion of the District Court's statement does not rely on the Couch Affidavit.  It can be determined from reading the West Virginia Complaint.

40

basis for reversible error, since excising it would not alter the Court's stated reasoning.  The second potential reference to facts in the Couch Affidavit is in a footnote discussion about which of the policies attached to the complaint apply. (JA336 n.3.)  Determining which policy applied was basic information necessary to determine coverage, and cannot be considered extrinsic.[20]  (*Id.*)  The third reference appeared when the District Court distinguished *C.Y. Thompson*, and the court noted that "creating a pill mill with widespread addiction, cannot be said to be a *normal* consequences of distributing prescription drugs to three pharmacies in a state over a limited time."  (JA339 (emphasis added).)  This statement does not give rise to reversible error, especially since, as previously discussed, a determination of which of the polices attached to the Complaint applied to the West Virginia Action would have given the District Court at least the relevant time frame, even in the absence of the Couch Affidavit.[21]

---

20. The District Court also sought this information from the parties at the hearing held on the motions. JA318-19; *see, e.g.*, *Allstate Ins. Co. v. Best*, 728 F. Supp. 1263, 1263-66 (D.S.C. 1990) ("Reference to the insurance policy itself is essential to determine whether a duty to defend arises in a particular case.").

21. An arguable fourth reference is where the District Court quoted J M Smith's Opposition Brief as a description of what "J M Smith contends."  (*See* JA339 (quoting JA250).)  However, this is a description of J M Smith's arguments, not a finding or conclusion of the District Court.

41

Moreover, even if the Court were to find nothing in the above argument of merit, there still would be no basis for reversing the District Court. Any error was harmless, and the Court, in its *de novo* consideration of the issues, has ample grounds on which to find coverage here. (*See supra* Section II.A-C.)[22]

## III.    J M SMITH SHOULD NOT BE DENIED COVERAGE UNDER THE POLICIES' BODILY INJURY PROVISION.

In this Appeal, Liberty Mutual raises for the first time the argument that it has no duty to defend because the West Virginia Complaint does not seek damages because of "bodily injury." (Appellant's Br. at 23-28.) Liberty Mutual's argument fails because — despite its insistence that it preserved the issue — Liberty Mutual did not raise the issue below. However, even if Liberty Mutual had not waived the issue, the West Virginia Complaint seeks covered damages.

### A.    Liberty Mutual Has Waived the Issue of Bodily Injury.

It is a well-settled rule that litigants, having failed to raise an argument below, cannot later attempt to argue it on appeal. *See, e.g.*, *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (noting that "issues raised for the

---

22. In order to avoid any question that it is relying on unavailable evidence, J M Smith has deliberately not relied on the Couch Affidavit in its duty to defend argument. (*See surpa* Section II.A-C.) However, that is not a concession that the Court should ignore facts enumerated here, about J M Smith's limited activities in West Virginia, if it finds such consideration warranted.

first time on appeal generally will not be considered"); *Jones v. Lib. Mut. Ins. Co.*

*(In re Wallace & Gale Co.)*, 385 F.3d 820, 835 (4th Cir. 2004) (same).  On its

motion below, Liberty Mutual sought summary judgment on narrow grounds and

made this explicit at the outset of its opening brief: "This Motion presents a

threshold issue:  Does the West Virginia Complaint allege a covered occurrence?"

(JA201.)  Liberty Mutual mentioned the issue of bodily injury only in one footnote.

(JA206 n.3 ("[O]ther policy terms bar or limit coverage for the West Virginia suit.

For example, the policies, as relevant here, insure only against damages 'because

of 'bodily injury'' . . . .").)[23]  Liberty Mutual did not raise the argument based on

damages because of "bodily injury" at any other time before the District Court,

despite J M Smith's submission of a cross-motion for summary judgment on the

entire question of the duty to defend, to which Liberty Mutual had full opportunity

to respond.  In fact, at oral argument, the Court brought up the issue *sua sponte*,

and — as detailed below — Liberty Mutual admitted that the issue had not been

meaningfully presented to the court.[24]

---

23. In the footnote, Liberty Mutual goes on to state:  "Thus, while there are other
    reasons why coverage is not provided, the 'occurrence' question is particularly
    amenable to summary judgment . . . ." (JA206.)

24. In addition, Liberty Mutual's successful motion for certification under Federal
    Rule of Civil Procedure 54(b) rendered the Opinion final, on the basis that it
    was the "ultimate disposition" on the duty to defend.  (JA350; JA359.)

43

Now, suddenly, on appeal, Liberty Mutual attempts to negate coverage by arguing that the West Virginia Complaint does not seek damages because of "bodily injury." In a footnote in its opening appellate brief, Liberty Mutual claims that it "specifically preserved this issue" (Appellant's Br. at 24 n.12), and cites an excerpt from the oral argument transcript: "MS. FOGGAN: . . . Liberty Mutual has specifically raised that point [whether the complaint seeks damages for 'bodily injury'] and reserved on it in its complaint and in its motion papers here . . . ." (Appellant's Br. at 24 n.12 (citing JA321:5-6).) It is revealing that Liberty Mutual does not quote the remainder of the excerpt, in which Ms. Foggan (counsel for Liberty Mutual) plainly admitted that Liberty Mutual had not argued the issue of bodily injury: "[I]f for some reason the court did not enter summary judgment in Liberty Mutual's favor, . . . it should not enter summary judgment beyond the question of occurrence . . . because [whether the complaint seeks damages for 'bodily injury'] **has not been meaningfully presented to the court**." (*See* JA321:7-11 (emphasis added).)[25]

---

25. Ms. Foggan described this issue as being "reserved" (JA321:6), but this has no procedural meaning, especially in light of the fact that J M Smith's cross-motion on the duty to defend was also before the court. Even if Liberty Mutual believed it had "reserved" the issue in its own summary judgment motion until some later date, defending against Liberty Mutual's cross-motion required it to

(Footnote continued on next page)

Having made a deliberate decision to base its motion for summary judgment solely on the issue of an "occurrence," Liberty Mutual cannot argue the issue for the first time on appeal. *See Muth*, 1 F.3d at 250; *In re Wallace*, 385 F.3d at 835; *Hardeman v. City of Albuquerque*, 377 F.3d 1106, 1122 (10th Cir. 2004) (refusing to consider an argument despite defendant's insistence that they preserved it in a footnote); *United States v. Quinones*, 317 F.3d 86, 90 (2d. Cir 2002) ("[It is a] well-settled rule that '[w]e do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.'").

## B.    The West Virginia Complaint Seeks Damages Because of Bodily Injury.

Even assuming that Liberty Mutual did not waive its bodily injury argument, its argument still fails. Liberty Mutual contends that, if the West Virginia Complaint alleges an occurrence, it still only seeks to recover damages because of economic harm and, therefore, coverage is inappropriate. (Appellant's Br. at 23-28.) However, the West Virginia Complaint seeks damages related to prescription drug abuse, which causes addiction, increased injury, and death.

Under the policies, Liberty Mutual has the duty to defend J M Smith in any "'suit' seeking . . . damages for 'bodily injury' . . . caused by an

---

(Footnote continued from prior page)

address all of J M Smith's arguments regarding Liberty Mutual's duty to defend.

'occurrence.'" (JA117 ¶ 1(a)-1(b)(1).) "Bodily injury" means "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (JA129 ¶ 3.)[26] Further, "[d]amages because of 'bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the 'bodily injury.'" (JA118 ¶ 1(e).)

At its core, the West Virginia Complaint seeks compensation for expenses, damages, and losses incurred because of the addiction, increased injury, and death arising from prescription drug abuse. Indeed, some of the damages sought are for West Virginia's allegedly increased healthcare costs attributable to prescription drug abuse. (*See* JA141-42 ¶ 6(b)-(d) ("The problems, . . . damages and losses related to the prescription drug epidemic in West Virginia include, *inter alia*, the following: . . . A per capita death rate from prescription drug overdose which has at times been either the highest or the second highest recorded for all states in the United States"; a death rate that "quadrupled from 5.1 deaths per 100,000 residents to 21.5" between 2001 and 2008; a statistic from one West Virginia hospital that "approximately twenty (20) percent of patients admitted

---

26. The policies provide coverage for damages "because of bodily injury," not for damages "for bodily injury." Courts have generally interpreted the phrase "because of bodily injury" more broadly. *See Medmarc Cas. Ins. Co. v. Avent Am., Inc.*, 612 F.3d 607, 616 (7th Cir. 2010).

through the hospital's trauma service have an issue with narcotic usage which contributes to their injuries"; and "the growing problem of addiction and management of addicted patients.").)

Courts addressing analogous claims under substantially similar insurance provisions have found a duty to defend. For example, in *SIG Arms Inc. v. Employers Insurance of Wausau*, the court considered claims against firearms manufacturers brought by municipalities that alleged they had incurred costs as a result of the manufacturers' negligent and deceptive marketing. 122 F. Supp. 2d 255, 260-61 (D.N.H. 2000). Costs included those associated with an increased police force, emergency services, medical care, hospital care, social services, loss tax revenue, and correction and rehabilitation services. *Id*. at 257. Despite arguments that the underlying complaint alleged only economic losses, the court found that a duty to defend existed, especially in light of the provision in the policy that "damages claimed by any person or organization for care, loss of services or death resulting at any time from 'bodily injury,'" *id*. at 260-61 — a provision identical to one here (JA118 ¶ 1(e)). The court noted that "[t]he plain meaning of the provision is to provide coverage when a claim is made, as in the underlying lawsuits here, seeking costs of providing care for shooting victims and for the loss of their services." *Id*. at 260. Similarly, here, among the damages that the Attorney General is seeking are costs associated with providing care for addicts.

47

(*E.g.*, JA141-41, 147, 153 ¶¶ 6(a)-(d), 19, 21, 44.)  *See also Scottsdale Ins. Co. v. Nat'l Shooting Sports Found.*, No. 99-316046, 2000 WL 1029091, at *2 (5th Cir. July 11, 2000) (unpublished opinion) (per curiam) (affirming duty to defend underlying suit brought by City of New Orleans against firearms trade association and rejecting argument that plaintiff seeking damages must be the one who suffered the bodily injury); *N.A.A.C.P. v. Acusport Corp.*, 253 F. Supp. 2d 459, 463 (E.D.N.Y. 2003) (duty to defend existed in underlying action brought against distributor of firearms by civil rights organization that sought contribution to funds for education and supervision of gun dealers; court noted that although "claims [were] a step removed," "[t]he claimed injury arises from exposure to allegedly general harmful conditions" and there was a "connection, however remote, between injuries to persons and liability for that injury of the insured").

In addition, because the West Virginia Complaint seeks damages for the healthcare costs attributable to prescription drug use, the cases Liberty Mutual cites are either inapplicable or distinguishable.  Two of the cases do not even address damages because of bodily injury; they address property damage.  In *Industrial Enterprises, Inc. v. Penn American Insurance Co.*, the court considered a complex property damage question involving regulatory cleanup costs.  637 F.3d 481, 489-90 (4th Cir. 2011) (applying Maryland law).  The court held that there was no duty to defend because the EPA was asking for costs associated with

48

regulatory liability in its role as a regulatory agent, not for damages to property or because it had a property interest in the contaminated site. *Id.* Here, the West Virginia Attorney General is not seeking regulatory costs or suing as a regulatory agent.[27]

Liberty Mutual's reliance on *Auto Owners Insurance Co. v. Newman*, 684 S.E.2d 541 (S.C. 2009), is also inappropriate. Liberty Mutual cites *Newman* to support its argument that "CGL policies are not designed to cover claims for economic losses." (Appellant's Br. at 25.) However, in *Newman*, the court held that the insurer *had* a duty to defend because the underlying claim was for both economic losses caused by faulty workmanship *and* property damage. 684 S.E.2d at 544. Similarly, the West Virginia Complaint alleges both economic losses caused by prescription drug abuse and bodily injury. (*See* JA141-42 ¶ 6(b)-(d).)

The two other cases Liberty Mutual relies on are also distinguishable because the underlying allegations in both were void of claims for bodily injury. (*See* Appellant's Br. at 26-27.) In *Steadfast Insurance Co. v. Purdue Frederick*

_____

27. Liberty Mutual's citation of this case is perhaps a backdoor acknowledgement of the fact that it has a waiver problem. In *Industrial Enterprises*, the Court rejected a waiver argument. There, however, the insurance company had submitted briefs on the issue in question and both parties had argued it extensively at oral argument. 637 F.3d at 486. Here, there is no similar evidence showing that the issue of bodily injury was extensively argued below.

*Co.*, four putative classes and the West Virginia Attorney General brought suits against Purdue, alleging that it had inappropriately marketed OxyContin.  No. X08CV020191697S, 2006 WL 1149202 (Conn. Super. Ct. Apr. 10, 2006) (applying Connecticut law).  Although acknowledging that the issue was "a close one," the Connecticut court found that none of the class actions sought compensation for bodily injury.  2006 WL 1149202, at *3.  Two of the four classes expressly excluded "any persons seeking to assert a personal injury claim"; the third sought only disgorgement of profits, injunctive relief and attorneys' fees; and the fourth sought restitution, not for bodily injury, but for Purdue's allegedly unjust behavior which "resulted in a dominant position in the market causing the plaintiff to pay more for OxyContin."  *Id*.  at *2-4.  Here, by contrast, the West Virginia Complaint contains allegations of overdose deaths, increased injuries because of prescription drug use, and addiction, which the court in *Steadfast* acknowledged "may be a bodily injury."  *Id.* at *2 n.2; (JA141-42 ¶ 6(b)-(d).).

In *Medmarc v. Avent America*, the theory of relief in the underlying complaint was that plaintiffs would not have purchased Avent's products had Avent disclosed information about the health risks of BPA exposure.  612 F.3d at 610.  The court noted that the problem with Avent's coverage argument was that the underlying complaint was void of any allegation of actual physical harm: "Even if the underlying plaintiffs proved every factual allegation in the underlying

50

complaints, the plaintiffs could not collect for bodily injury because the complaints do not allege any bodily injury occurred." *Id.* at 614. Here, however, it is apparent that the West Virginia Complaint contains allegations of bodily injury. (JA141-42 ¶ 6(b)-(d).)

In addition to seeking damages for healthcare costs, the West Virginia Complaint includes a cause of action for medical monitoring (JA156-58 ¶¶ 61-66), which separately satisfies the bodily injury requirement of the policies.[28] Although Liberty Mutual insists that medical monitoring does not fall within the meaning of "bodily injury," that is contrary to the holdings of a number of courts that have considered the issue. Where a cause of action for medical monitoring is coupled with allegations of actual physical injury, the bodily injury requirement will be satisfied. *See Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 126 F. Supp. 2d 596, 637-38 (W.D.N.Y. 2001) (claims seeking a fund for medical monitoring, coupled with allegations that plaintiffs are at a high risk for developing cancer due to their exposure, alleged "bodily injury"), *aff'd in part, rev'd in part on other grounds*, 302 F.3d 83 (2d Cir. 2002); *Baughman v. U.S. Liab. Ins. Co.*, 662 F.

---

28. On or about January 2, 2014, the Attorney General served an amended complaint in the West Virginia Action. Although substantially similar to the original complaint, the amended complaint did not include the claim for medical monitoring. In any event, it is not the subject of this proceeding.

Supp. 2d 386, 396 (D.N.J. 2009) (a medical monitoring claim triggered the duty to indemnify because the allegations of exposure to mercury resulted in an increased risk of illness that satisfied the "bodily injury" requirement); *but cf. HPF, L.L.C. v. Gen. Star Indem. Co.*, 788 N.E.2d 753, 757 (Ill. 2003) (denying coverage for an action seeking medical monitoring because the underlying complaint "[did] not make a single allegation that HPF's herbal products caused bodily injury or even that they may cause bodily injury" (alteration in original)).  Here, the West Virginia's medical monitoring allegation is coupled with allegations of actual bodily injury (JA141-42 ¶ 6(b)-(d)); therefore, coverage is appropriate.

## IV.    THE DISTRICT COURT PROPERLY DENIED SUMMARY JUDGMENT ON THE DUTY TO INDEMNIFY.

Having found that Liberty Mutual had a duty to defend, the District Court properly held that summary judgment was not warranted on whether Liberty Mutual had a duty to indemnify J M Smith for all or part of any damages that might be awarded in the West Virginia Action.  (JA340.)[29]  As the District Court stated, "a liability insurer's duty to indemnify is determined by the findings of the fact finder in the underlying case."  (*Id.* (citing *Ellett Bros.*, 275 F.3d at 388-89).)

---

29. In the same discussion, and based on the same reasoning, the District Court also denied J M Smith's breach of contract claim, included in its cross-motion, as premature.  (JA340-41.)  J M Smith does not appeal from this denial, since the issue was not decided on the merits.  As with the duty to indemnify claim, it will be addressed before the District Court when it is ripe for decision.

Therefore, a decision on the scope of Liberty Mutual's duty to indemnify is premature.   If this Court upholds the District Court's ruling on Liberty Mutual's duty to defend in the West Virginia Action, it should uphold the District Court's denial of summary judgment on the duty to indemnify.

## V.    POLICY CONSIDERATIONS FAVOR FINDING A DUTY TO DEFEND IN THE WEST VIRGINIA ACTION.

Liberty Mutual ends its brief with an argument that upholding the District Court's Opinion would "undermine the certainty and predictability necessary to the proper functioning of the insurance system."  (Appellant's Br. at 29.)  According to Liberty Mutual, the Opinion is so far afield that it threatens an upset of the entire insurance industry.  (*Id.*)

This baseless and exaggerated fearmongering is an attempt to shift focus from the fact that it is actually *Liberty Mutual*'s argument, not the District Court's opinion, which is out of sync with the proper functioning of the insurance system because it would reverse the basic duty to defend standard.

Under South Carolina law, the general rule is that insurance coverage is based on the claims as pled in the "four corners" of the underlying complaint, plus the facts known to the insurer.[30]  A complaint alleging alternative theories of

---

30. *E.g., Jessco*, 471 F. App'x at 228; *Hartsville*, 677 S.E.2d at 544 ("[T]he allegations of the complaint determine the insurer's duty to defend."); *see also*

(Footnote continued on next page)

negligent and intentional conduct is necessarily defended by insurers, since the rule is that if the complaint pleads any potentially covered cause of action, then a duty to defend is triggered, with any ambiguity being resolved in favor of the insured.[31] However, since this type of binary analysis can give rise to underlying plaintiffs seeking to gain access to the deep pockets of insurance companies simply by tacking on a negligence claim when in fact the only conduct at issue is intentional in nature, South Carolina also recognizes that a more nuanced analysis can be required to "look beyond the labels of the complaint."[32]  In exceptional instances, where the conduct complained of is purely intentional, this analysis can result in a

---

(Footnote continued from prior page)

Leo P. Martinez et al., *supra* § 11.11[1][a] ("In general, an insurer's duty to defend against a liability claim is determined by comparing the allegations of the underlying complaint with the terms of the insurance policy. . . .  This process is often referred to as the comparison, [or] 'four corners' . . . test.").

31. *E.g.*, *Ellett Bros.*, 275 F.3d at 388; *Cincinnati Ins.*, 2013 WL 1282017, at *8, *10; *Berenyi*, 2010 WL 233861, at *4; *see also* 1 Barry R. Ostrager & Thomas R. Newman, Handbook on Insurance Coverage Disputes § 5.02[b] (Supp. 2011) ("It is generally held that if one claim in a multiple claim complaint potentially falls within the indemnity coverage of the policy, the insurer must defend the entire action.").

32. *See* Leo P. Martinez et al., *supra* § 11A.12[2] ("It is a truism that plaintiff's attorneys often seek to implicate the defendant's insurance by pleading an otherwise not covered claim in a manner that suggests the potential for coverage. . . . [Therefore, the legal theories used or labels used in captioning them] will not give rise to a duty to defend an otherwise not covered lawsuit, at least to the extent the predicate facts are not alleged."); *see generally Collins*, 666 S.E.2d at 899-900.

finding of no coverage, even if the complaint facially contains claims of negligence. South Carolina articulated this concept in *Collins*, in recognition that, where the harms alleged were based *only* on intentional conduct, coverage should not be found solely because of the inclusion of claims pleading negligence. *Collins* does not represent any change in the scope of an insurer's duty to defend, but only the need in some instances to consider the nature of the actions that serve as the basis for the claims in the underlying complaint.

Here, although couching its argument in the language of *Collins*, what Liberty Mutual is actually asking is not that the Court apply *Collins*, but that the Court take a large step beyond the holding of *Collins* and find that, if a complaint contains *any* claims based on intentional conduct, no duty to defend exists. Even more startling, in this case, unlike in *Collins* and the other cases relied upon by Liberty Mutual, there are no factual allegations of intentional conduct by J M Smith to substantiate the intentional conduct claims. Just as South Carolina law does not permit a negligence label alone to trigger a duty of defend, it cannot, as Liberty Mutual urges here, permit an intentional label alone to vitiate that duty. This argument has the potential to permit insurance companies to deny coverage in every complaint that alleges alternative theories of liability. This is not the law, and surely not what the Supreme Court of South Carolina intended in *Collins*.

55

## CONCLUSION

For all the foregoing reasons, Appellees respectfully request that the

Court affirm the decision of the District Court.

## REQUEST FOR ORAL ARGUMENT

Appellees believe that oral argument would aid the Court and

respectfully request oral argument pursuant to Local Rule 34(a).

Dated:  New York, New York         Respectfully submitted,
       March 4, 2014

                                 /s/ George A. Tsougarakis
                                 George A. Tsougarakis
                                 Amera Z. Chowhan
                                 Taylor K. Herman
                                 HUGHES HUBBARD & REED LLP
                                 One Battery Park Plaza
                                 New York, New York 10004-1482
                                 (212) 837-6000

                                 Robert M. Barrett
                                 Perry D. Boulier
                                 HOLCOMBE BOMAR, PA
                                 100 Dunbar Street, Suite 200
                                 Spartanburg, South Carolina 29306
                                 (864) 594-5300

                                 *Counsel for Appellees*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No.:  13-2451      Caption:    Liberty Mutual Fire Ins. Co. v. J M Smith Corp. et al

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation**: Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☒ this brief contains 13,502 words, excluding parts of the brief exempted by Fed. R. App. P. 32 (a)(7)(B)(iii), *or*

   ☐ this brief uses a monospaced typeface and contains [_____] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements**: A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☒ this brief has been prepared in a proportionally spaced typeface using:

          Microsoft Word 2010_____ in    *[identify word processing program]*

          14 point Times New Roman_____    *[identify font size and type style]*

   ☐ this brief has been prepared in a monospaced typeface using:

          _____ in    *[identify word processing program]*

          _____    *[identify font size and type style]*

(s) George A. Tsougarakis_____
Attorney for Appellees
Dated:  March 4, 2014

# United States Court of Appeals
## for the Fourth Circuit

13-2451, *Liberty Mutual Fire Insurance v. JM Smith Corporation*

## CERTIFICATE OF SERVICE

I, Maryna Sapyelkina, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

On **March 4, 2014**, Counsel for Appellees has authorized me to electronically file the foregoing **Brief for Defendants-Appellees** with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

LAURA ANNE FOGGAN
WILEY REIN, LLP
1776 K STREET, NW
Washington, DC 20006-0000
(202) 719-7000
lfoggan@wileyrein.com

MORGAN STUART TEMPTON
WALL TEMPLETON & HALDRUP, PA
145 King Street, PO Box 1200
Suite 302
Charleston, SC 29402
(843) 329-9500
Morgan.templeton@walltempleton.com

Attorneys for Plaintiff-Appellant

Unless otherwise noted, 8 paper copies have been filed with the Court on the same date via U.S. Express Mail.

March 4, 2014

/s/ Maryna Sapyelkina
Maryna Sapyelkina